UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

DERRICK STORMS, ADRIAN BATLLE, A1
PROCUREMENT, LLC, A1 PROCUREMENT
JVH, A1 PROCUREMENT – TRANSPORTATION
LEASING CORP., LLC, A1 PROCUREMENT,
JVG,

                    Plaintiffs,

        v.

UNITED STATES OF AMERICA, DEPARTMENT
OF VETERANS AFFAIRS, ERIC K. SHINSEKI,
SCOTT W. GOULD, JOHN R. GINGRICH,
DAVID H. ECKENRODE, THOMAS J. LENEY,
JAN R. FRYE, WILLIAM A. COX, GREGORY
VOGT, ERNEST MONTELEONE, DELIA
ADAMS, JOHN FEDKEN HEUER, DENNIS
FOLEY, JUSTINA HAMBERG, JAYSAN HWANG,
ANDREA M. GARDNER-INCE, SUPERVISORS
OF THE 8127 DEBARMENT COMMITTEE,
SUPERVISORS OF THE CENTER FOR
VETERANS ENTERPRISE, and JOHN/JANE
DOES 1-100,

                    Defendants.

**MEMORANDUM & ORDER**
13-CV-811 (MKB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Derrick Storms, Adrian Batlle, A1 Procurement, LLC, A1 Procurement JVH,

A1 Procurement-transportation Leasing Corp., LLC and A1 Procurement, JVG bring the above-

captioned action against Defendants the United States of America, Department of Veterans

Affairs ("VA"), Erick K. Shinseki, Scott W. Gould, John R. Gingrich, David H. Eckenrode,

Thomas J. Leney, Jan R. Frye, William A. Cox, Gregory Vogt, Ernest Monteleone, Delia

Adams, John Fedkenheuer, Dennis Foley, Justina Hamberg, Jayson Hwang, Andrea M. Gardner-

Ince, Supervisors of the 8127 Debarment Committee, Supervisors of the Center for Veterans

Enterprise and unknown employees of the VA, "John and Jane Does 1-100," asserting claims pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Federal Tort Claims Act ("FTCA"), the Declaratory Judgment Act, and the Administrative Procedures Act ("APA"). (Sec. Am. Compl., Docket Entry No. 47.) Plaintiffs seek monetary damages as well as injunctive, declaratory and equitable relief. (*Id*. at 71–72.)

Defendants move to dismiss the Second Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The Court heard oral argument on September 23, 2014. At the oral argument, the Court dismissed Plaintiffs' RICO claim without prejudice for failure to allege two racketeering acts.[1] For the reasons discussed below, the Court grants Defendants' motion to dismiss the Second Amended Complaint. Plaintiffs are permitted to amend the Second Amended Complaint as to their RICO claim and their claims under the Declaratory Judgment Act and the APA as to the VA's Center for Veterans Enterprise's ("CVE") denial of Plaintiffs' request for reconsideration of CVE's August 9, 2011 decision to remove A1 Procurement, LLC from the VA's Vendor Information Pages.

## I. Background

Plaintiffs allege misconduct by Defendants in rendering certain decisions affecting Plaintiffs' ability to obtain set-aside government contracts through the VA's "qualified Service-Disabled, Veteran-Owned Small Business ("SDVOSB")" program, and in failing to pay

---

[1] Plaintiffs moved to consolidate this action with another action, *Batlle v. United States*, No. 14-CV-2359, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, (Docket Entry Nos. 64, 79), and to supplement the Second Amended Complaint in the above-captioned action with an April 7, 2014 letter from the VA denying Plaintiffs' September 11, 2013 administrative claim, (Docket Entry No. 79). The Court granted both of Plaintiffs' motions at oral argument on September 23, 2014.

Plaintiffs for their services pursuant to a contract for the use of a para-transit bus.

### a. Qualification of A1 Procurement, LLC as a SDVOSB

According to the Second Amended Complaint, on April 7, 2010, the CVE, an office of the VA charged with evaluating applications from federal government contractors for potential inclusion in the VA's Vendor Information Pages ("VIP") database, determined that A1 Procurement, LLC ("A1") was an eligible SDVOSB and granted A1's application for inclusion in its VIP database.[2] (Sec. Am. Compl. ¶ 37.)  The VIP database includes all SDVOSBs and Veteran Owned Small Businesses ("VOSBs") that are verified to be at least 51% "owned and controlled" by a veteran or service-disabled veteran.  (*Id*.)  Inclusion in the VIP database is a prerequisite to bidding on certain contracts that are set aside for qualified veteran-controlled businesses.  (*Id*. ¶ 2 n.1.)  In granting A1's application, the CVE "unequivocally determined" that A1 was owned and controlled by Storms, a service-disabled veteran and A1's Chief Executive Officer ("CEO"), and that Storms was a 51% majority owner of A1.  (*Id*. ¶¶ 12, 38.)

On April 25, 2011, Storms "criticized" Eckenrode, a CVE employee, for failing to remove unverified contractors from the VIP database in accordance with the Small Business Verification Act, and a "personal feud ensued" between Storms and Eckenrode.  (*Id*. ¶¶ 38–39.)  After this "disagreement," Eckenrode was appointed as Deputy Director of the CVE.  (*Id*. ¶ 40.)

### b. The CVE removal decision

On August 9, 2011, Eckenrode "abused" his position as Deputy Director of the CVE when he removed A1 from the VIP database "without good cause" (the "CVE Removal Decision").  (*Id*. ¶ 41.)  A1 was removed from the VIP database because Storms' resume

---

[2] The facts alleged in the Second Amended Complaint are assumed to be true for the purposes of deciding the motion.

indicated that in addition to his role as CEO of A1, he served as President of Homeless Veterans of America, Inc., and as managing partner of Storms and Associates, P.A. (*Id*. ¶ 42.) The CVE "unscrupulously" decided that it could not determine, in light of his other responsibilities, that Storms controlled A1. (*Id*. ¶ 46.) The CVE Removal Decision was in retaliation for the "personal feud" between Storms and Eckenrode. (*Id*. ¶¶ 38–39, 45.) The CVE Removal Decision intentionally violated Plaintiffs' Fifth Amendment substantive due process rights and was made without "any clear evidence of disqualification of eligibility in the VIP database." (*Id*. ¶¶ 48–49.) Storms never received any compensation or benefits for "volunteering" at the Homeless Veterans of America ("HVA"), and he worked approximately three to four hours each month at HVA. (Sec. Am. Compl. ¶ 43.) Storms and Associates, P.A. is a "one-man law firm that . . . Storms started to support A1 in legal matters." (*Id*. ¶ 44.) Storms worked less than seventeen hours at Storms and Associates, P.A. over the course of two years. (*Id*.)

### c. A1's request for reconsideration of the CVE Removal Decision

On August 23, 2011, A1 filed a request for reconsideration of the CVE's Decision ("Reconsideration Request"). (*Id*. ¶ 52.) A1 submitted a copy of its Reconsideration Request to Senator Marco Rubio's office at the same time that it submitted the request to the CVE. In its Reconsideration Request, A1 stated that Storms works full-time at A1, and only a few hours at HVA and Storms and Associates. (*Id*. ¶ 53.) After A1 contacted the CVE to determine the status of its Reconsideration Request, the CVE "intentionally misrepresented that it had not received" the Reconsideration Request "to intentionally inflict severe emotional distress" on Storms and Batlle. (*Id*. ¶ 58.) A1 contacted Senator Rubio's office to "inform him of the CVE's unethical and bad faith conduct" and Senator Rubio's office contacted the CVE on September 21, 2011. (*Id*. ¶¶ 60–61.) The CVE thereafter "changed its position and stated that it had timely

received A1's [Reconsideration Request]" and that it would "render a decision . . . no later than October 28, 2011." (*Id.* ¶ 61.)  In violation of 38 C.F.R. § 74.13(b), the CVE failed to issue a decision by October 28, 2011, thereby allegedly violating Plaintiffs' procedural due process rights by denying A1 "a meaningful process to review and respond to" the CVE Removal Decision.  (*Id.* ¶ 62.)  The CVE failed to timely issue a decision on A1's Reconsideration Request, waiting over two years "until being ordered to do so by this Court."[3] (*Id.* ¶ 63 (citing Minute Entry dated Aug. 9, 2013 ("order[ing] Defendant Department of Veteran Affairs to rule on A1['s] pending request for reconsideration")).)  On or about August 12, 2013, CVE denied A1's Reconsideration Request (the "Reconsideration Decision").  (*Id.* ¶¶ 131–32.)  "The CVE took 2,280% longer to issue A1s decision than other decisions issued in August 2013."  (*Id.* ¶ 65.)

### d.  Debarment

After A1 contacted Senator Marco Rubio's office to complain about CVE's delay in acting on their Reconsideration Request, on January 20, 2012, the VA "unlawfully" issued proposed debarment notices to Storms, Batlle, and A1.  (*Id.* ¶ 69.)  The proposed debarment notices advised them that the VA was initiating debarment proceedings against Storms, Batlle and A1 for "allegedly misrepresenting A1's SDVOSB status" while submitting a quotation as part of a bid for a government contract in November 2011.  (*Id.* ¶ 69.)

In or about March 2012, Storms contacted Cox, a VA employee and designated point of contact for the VA 8127 Debarment Committee, to determine the status of the proposed debarment.  (*Id.* ¶ 71.)  Cox indicated that the 8127 Debarment Committee was considering

---

[3] Plaintiffs argue that this delay constituted "an intentional tortious act" as the CVE rendered decisions on other applicants' requests for reconsideration within thirty-one days of receipt.  (Sec. Am. Compl. ¶ 64.)

"additional information not provided in the [d]ebarment [n]otices." (*Id.*) Storms told Cox that they had a "legal right to review and respond to any additional allegations not provided in the [d]ebarment [n]otices" and failure to provide them with the additional allegations violated their procedural due process rights. (*Id.*) Defendants refused to allow Storms, Batlle and A1 to review the additional allegations being considered in the debarment proceeding. (*Id.* ¶ 72.)

On May 2, 2012, Frye, the VA Debarring Official, issued notices of debarment to Storms, Batlle and A1 "debarring each for five (5) years from government-wide contracting with any federal agency," ("Debarment"). (*Id.* ¶ 74.) Defendants thereafter "intentionally and unlawfully publically humiliated" Storms, Batlle and A1 by posting their names on the VA 8127 Debarment Committee website and alerting the public to the five-year Debarment. (*Id.* ¶¶ 75–76.) The Debarment listed several grounds to debar Plaintiffs that were not mentioned in the proposed debarment notices. (*Id.* ¶ 77.) Defendants exceeded their jurisdiction and authority by, *inter alia*, debarring Storms, Batlle and A1 "on unlawful, unjustifiable and impressible grounds" and by debarring them from all federal agencies. (*Id.* ¶¶ 84, 89.)

On February 19, 2013, the Debarment was vacated by the VA.[4] (*See* Docket Entry No. 9 at ECF 2.) Defendants inflicted severe emotional distress on Plaintiffs by stating in a submission to the Court on March 14, 2014, that the "VA is presently considering whether to recommence debarment proceedings, and is refraining from ruling on the reconsideration pending that decision and any future debarment proceedings against Plaintiffs." (Sec. Am. Compl. ¶ 83.)

---

[4] Defendants have represented to the Court that the Debarment was vacated because it was partially based on incidents that were not specified in the proposed debarment notices and Plaintiffs were not given an opportunity to respond to the charges prior to the Debarment. (Sec. Am. Compl. ¶ 82.)

### e. Alleged conspiracy

Plaintiffs allege that the CVE Removal Decision was the result of a conspiracy between Eckenrode, Leney, the Supervisors of the CVE, and John/Jane Does 1–100, to remove A1 from the VIP database. These Defendants "broadened their conspiracy by instructing the Supervisors of the CVE and John/Jane Does 1–100 Defendants to deny receiving A1's request for reconsideration and to refrain from ruling on A1's request for reconsideration." (*Id.* ¶¶ 120–21.) All of the individual Defendants also conspired to deny Plaintiffs' procedural and substantive due process rights during the Debarment and to "debar Plaintiffs by any means necessary." (*Id.* ¶ 122.)

### f. Bus Contract

After the Debarment, Vogt, a contracting officer at the VA, and Monteleone, a facility manager at the VA, refused to pay Plaintiffs under a preexisting contract for the lease of Plaintiffs' bus, ("Bus Contract"). (*Id.* ¶¶ 26–27, 123.) Foley, VA's primary legal counsel in Washington D.C., instructed Vogt and Monteleone not to pay Plaintiffs under the Bus Contract. Vogt would not pay Plaintiffs for the bus until Foley approved payment, stating that he "was not sure why A1 was debarred but whatever action was done by A1 had to be something serious." (*Id.* ¶ 125.)

On August 9, 2013, the Court instructed Defendants to pay Plaintiffs for using their para-transit bus but Defendants have refused to pay because Plaintiffs have submitted invoices to VA's counsel instead of directly to the VA.[5] (*Id.* ¶ 126.)

---

[5] At oral argument, counsel for Plaintiffs asserted that while the VA has since made payments under the Bus Contract, Plaintiffs have not been paid for all damages arising out of the Bus Contract claim, including attorney's fees and accrued interest.

### g. Administrative claim

Plaintiffs submitted an administrative claim to the VA on March 14, 2013, for "damages resulting from the individual Defendants' negligence, [intentional infliction of emotional distress ("IIED")], and extreme and outrageous conduct."[6] (*Id.* ¶ 140) The VA denied Plaintiffs' administrative claim on March 14, 2013, and Plaintiffs submitted an amended administrative claim dated September 11, 2013.[7] (*Id.*) The VA issued a "formal denial letter" of Plaintiffs' September 11, 2013 administrative claim on April 7, 2014 ("VA Denial Decision"). (Docket Entry No. 79.)

---

[6] Plaintiffs' March 14, 2013 administrative claim was submitted by Storms (as Plaintiffs' counsel), after the commencement of this action, in the form of an email to Defendants' counsel. The claim states in relevant part:

> "I write to supplement my prior claim to the Department of Veterans Affairs concerning Plaintiffs['] . . . claim for an official letter from the VA and rectifying Plaintiffs' damages. The VA's extremely outrageous actions . . . have resulted in $32 million dollars in damages to the Plaintiffs. You have previously written that the VA has declined to write a letter, rectify these damages, and resolve this claim."

(March 14, 2013 Email from Derrick Storms to Elliot Schachner, annexed to Sec. Am. Compl. as Ex. 40.)

[7] The Second Amended Complaint refers to the VA's denial of Plaintiffs' first administrative claim and states that a copy is attached but this document was not filed with the Court. (Sec. Am. Compl. ¶ 140.) Plaintiffs submitted their amended administrative claim using a "Standard Form 95" prescribed by the Department of Justice, and entitled, "Claim for Damage, Injury, or Death." The amended administrative claim states in relevant part that:

> The Dept. of Veterans Affairs . . . and its employees made, caused and conspired to intentionally inflict emotional distress on Derrick Storms, Adrian Batlle and their businesses . . . . The VA was also negligent in failing to follow mandatory VA regulations causing the unlawful debarment of Derrick Storms, Adrian Batlle, and A1 Procurement, LLC.

(Claim for Damage, Injury, or Death, annexed to Sec. Am. Compl. as Ex. 41.) The amended administrative claim alleges $32 million in total damages and attaches a copy of the First Amended Complaint filed in this action. (*Id.*)

### h. Battle Action

On April 11, 2014, Plaintiffs filed another action, *Battle v. United States*, No. 14-CV-2359, (the "Battle Action"). The Battle Action, which asserts claims solely against the United States, alleges identical claims under the FTCA to those alleged in the above-captioned action. Plaintiffs request that the Court (1) consolidate the Battle Action with the above-captioned action pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, (2) supplement the Second Amended Complaint to include the VA Denial Decision, and (3) take judicial notice of the Battle Action in issuing a decision on Defendants' motion to dismiss the Second Amended Complaint. (Docket Entry No. 79.) The Court consolidated both actions at the oral argument on September 23, 2014.

## II. Discussion

### a. Standards of Review

#### i. Rule 12(b)(1)

"[A] district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it." *Shabaj v. Holder*, 704 F.3d 234, 237 (2d Cir. 2013) (alteration in original) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). "'[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (alteration in original) (citations omitted), *aff'd*, 561 U.S. 247, 130 S. Ct. 2869 (2010). A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists. *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010); *Morrison*, 547 F.3d at 170.

### ii.   Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must take all of the factual allegations in the complaint as true." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)); *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678); *see also Pension Ben. Guar. Corp.*, 712 F.3d at 717–18.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (alteration in original) (quoting *Iqbal*, 556 U.S. at 679).  Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions."[8] *Iqbal*, 556 U.S. at 678.

---

[8]  When deciding a motion to dismiss, a court's review is limited to the four corners of the complaint but a court may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (documents attached to the complaint, those incorporated by reference, and those integral to the complaint); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records).

**b. Plaintiffs' *Bivens* claims**

Plaintiffs assert Fifth Amendment due process violations against Shinseki, Gould, Gingrich, Eckenrode, Leney, Frye, Cox, Vogt, Monteleone, Adams, Fedkenheuer, Foley, Hamberg, Hwang, Gardner-Ince, the Supervisors of the 8127 Debarment Committee Members, Supervisors of the CVE, and the unknown Defendants, John/Jane Does 1–100 (the "individual Defendants"), seeking monetary damages under *Bivens*. Plaintiffs allege that the individual Defendants "intentionally violated Plaintiffs' Fifth Amendment procedural and substantive due-process rights" by, among other things:

> denying A1's application without affording procedural due-process of law and based their decision on unjustifiable grounds, refused to consider A1's request for reconsideration for two years, denied A1's request for reconsideration without affording procedural due-process of law and based their decision on unjustifiable grounds, ignored multiple congressional admonishments and GAO recommendations, intentionally failed to follow mandatory VA procedures meant to protect Plaintiffs' procedural and substantive due-process rights, disregarded and were deliberately indifferent to VA officers and employees widespread constitutional violations committed against both veterans and Plaintiffs' constitutional rights, intentionally and unlawfully [d]ebarred the Plaintiffs without providing procedural and substantive due-process of law . . . [and] conspired to violate the Plaintiffs' Fifth Amendment procedural due process rights.

(Sec. Am. Compl. ¶ 144.) Plaintiffs further allege that the individual Defendants intentionally violated Plaintiffs' Fifth Amendment rights by "misrepresenting that they had not received A1's request for reconsideration prior to being contacted by Senator Rubio," misrepresenting the law in the debarment notice, "refusing to pay Plaintiffs for leasing Plaintiffs'. . . bus in violation of

---

If the court takes judicial notice of public records, it does so "in order to determine what statements they contained[,] but not for the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (alteration, citation and internal quotation marks omitted).

Plaintiffs' Fifth Amendment procedural and due process-rights," exceeding their scope and authority in the Debarment and other wrongful conduct in connection with the CVE Removal Decision, Reconsideration Request and Decision, and Debarment. (*Id.* ¶ 147.) Defendants argue that damages under *Bivens* are not available to Plaintiffs, because the Supreme Court has not recognized a *Bivens* remedy in any of the contexts presented by Plaintiffs' allegations, and *Bivens* relief should not be extended to Plaintiffs' claims. (Def. Mem. of Law in Support of Mot. to Dismiss ("Def. Mem.") 12–13.)

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court created a cause of action for violations of the Constitution by persons acting under the color of federal law. *See Iqbal*, 556 U.S. at 675 ("In *Bivens* — proceeding on the theory that a right suggests a remedy — this Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" (citations omitted)). The purpose of providing a remedy under *Bivens* is to "deter individual federal officers from committing constitutional violations." *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d. Cir. 2009) (citing *Corr. Servs. Corp. v. Malesko*, 535 U.S. 61, 66 (2001)). Therefore, "a *Bivens* action is brought against individuals, and any damages are payable by the offending officers." *Id.* (citing *Carlson v. Green*, 446 U.S. 14, 21 (1980)).

Because *Bivens* is the creation of federal common law, its application has been limited. *See Dotson v. Griesa*, 398 F.3d 156, 166 (2d Cir 2005) ("Because a *Bivens* action is a judicially created remedy, . . . courts proceed cautiously in extending such implied relief[.]"). "[T]he *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in 'new contexts.'" *Arar*, 585 F.3d at 571 (citing *Corr. Servs. Corp.*, 534 U.S. at 69. To date, the Supreme Court has extended this remedy in only three contexts: (1) unreasonable search and seizure in violation

of the Fourth Amendment, *Bivens*, 403 U.S. at 397; (2) employment discrimination in violation of the Due Process Clause, *Davis v. Passman*, 442 U.S. 228, 234 (1979); and (3) Eighth Amendment violation by prison officials, *Carlson v. Green*, 446 U.S. 14, 21 (1980). *See Arar*, 585 F.3d at 571 ("In the 38 years since *Bivens*, the Supreme Court has extended it twice only."); *see also Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th Cir. 2012) (The Supreme Court "has not created another [remedy under *Bivens*] during the last 32 years — though it has reversed more than a dozen appellate decisions that had created new actions for damages."); *Kelley v. Fed. Bureau of Investigation*, --- F. Supp. ---, 2014 WL 4523650, at *21 (D.D.C. Sept. 15, 2014) ("The Supreme Court has recognized a *Bivens* action in three contexts." (citing *Bivens*, 403 U.S. at 388, *Davis*, 442 U.S. at 228, and *Carlson*, 446 U.S. at 14)). Since its decision in *Carlson* in 1980, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp.*, 534 U.S. at 68; *Arar*, 585 F.3d at 572 ("Since *Carlson* in 1980, the Supreme Court has declined to extend the *Bivens* remedy in any new direction at all.").

The Second Circuit has counseled courts to "proceed cautiously" in awarding remedies under *Bivens*. *Dotson*, 398 F.3d at 166. In determining whether to allow a *Bivens* claim, a court must first consider whether *Bivens* has previously been extended to the type of claim asserted by the plaintiff, or whether the plaintiff's claim raises a "new context" for *Bivens* relief. *See Arar*, 585 F.3d at 572. The Supreme Court has not defined "context" for the purposes of determining the availability of *Bivens* relief. *See id.* (acknowledging that "[c]ontext is not defined in the case law"). However, the Second Circuit has instructed that in considering whether a claim presents a "new context" for a *Bivens* remedy, the word "context" should be construed "to reflect a potentially recurring scenario that has similar legal and factual components" to a claim that has

already been recognized as within the scope of *Bivens*. *Id.* at 572; *see also Hernandez v. United States*, 757 F.3d 249, 272 (5th Cir.) (noting that the court is "bound to examine each new context — that is, each new 'potentially recurring scenario that has similar legal and factual components'" (citing *Arar*, 585 F.3d at 572)), *reh'g en banc*, 771 F.3d 818 (5th Cir. 2014).

Consistent with this definition, courts have found that context refers not just to the particular cause of action asserted, or the type of constitutional right implicated, e.g., Fifth Amendment due process right, but also encapsulates both the legal theory of liability proposed as well as the factual circumstances of the claim.[9] *See Arar*, 585 F.3d at 572 (recognizing "international rendition, specifically, extraordinary rendition" as the context at issue); *Mirmehdi v. United States*, 689 F.3d 975, 981 (9th Cir. 2011) (recognizing deportation proceedings as the "context" at issue, and agreeing with the Second Circuit's decision in *Arar*, 585 F.3d at 572, construing context to "reflect a potentially recurring scenario that has similar legal and factual components"); *Hernandez*, 757 F.3d at 272 (noting that courts do not extend *Bivens* "amendment-by-amendment"); *Wilson v. Libby*, 498 F. Supp. 2d 74, 86 (D.D.C. 2007) ("*Bivens* actions are not recognized Amendment by Amendment in a wholesale fashion. Rather, they are context-specific."). A context is "new" under *Bivens* if it has not previously been afforded a *Bivens* remedy. *See Arar*, 585 F.3d at 572 (finding that the plaintiff's extraordinary rendition

---

[9] For example, while the Supreme Court has granted *Bivens* relief for certain claims alleging due process violations, it has not extended *Bivens* relief to all due process claims. *Compare Davis v. Passman*, 442 U.S. 228 (1979) (granting *Bivens* relief for a due process claim based on employment discrimination) *with Schweiker v. Chilicky*, 487 U.S. 412 (1988) (denying due process claim based on termination of Social Security benefits). *See also Atterbury v. Insley*, No. 12-CV-502(A), 2014 WL 131619 (W.D.N.Y. Mar 27, 2014) (dismissing due process claim based on order removing plaintiff from "Court Security Officer" duty); *Chao v. Holder*, No. 10-CV-2432, 2013 WL 4458998 (E.D.N.Y. Aug. 16, 2013) (dismissing due process claim based on unlawful detention).

claim raised a "new context" under *Bivens* because "no court has previously afforded a *Bivens* remedy for extraordinary rendition").

Thus, if a plaintiff's claim presents a "new context," the court must engage in a two-part inquiry to determine whether to extend *Bivens* relief. *Minneci v. Pollard*, 565 U.S. ---, ---, 132 S. Ct. 617, 621 (2012) ("[T]he decision whether to recognize a *Bivens* remedy may require two steps." (citing *Wilkie v. Robins*, 551 U.S. 537, 550 (2007))); *Arar*, 585 F.3d at 572 ("Once we have identified the context as 'new,' we must decide whether to recognize a *Bivens* remedy in that environment of fact and law. The Supreme Court tells us that this is a two-part inquiry."); *Aryai v. Forfeiture Support Assocs.*, 25 F. Supp. 3d 376, 392 (S.D.N.Y. 2012) ("Whether a court should recognize a *Bivens* remedy for a particular constitutional violation typically involves a two-step inquiry.") First, the court must assess "whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding" damages remedy. *Wilkie*, 551 U.S. at 550 (citing *Bush v. Lucas*, 462 U.S. 367, 378 (1983)). Second, "the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed . . . to any special factors counseling hesitation before authorizing a new kind of federal litigation." *Id*. (citing *Bush*, 462 U.S. at 378).

### i. Plaintiffs' claims present a "new context"

The Second Amended Complaint alleges procedural and substantive due process violations as a result of misconduct by the individual Defendants in (1) making certain decisions affecting Plaintiffs' ability to obtain set-aside government contracts, and (2) in failing to pay Plaintiffs for services under the Bus Contract. Plaintiffs argue that *Bivens* relief is available to remedy these alleged violations of the Fifth Amendment. (Pl. Mem. of Law in Opp'n to Def.

Mot. to Dismiss ("Pl. Opp'n") 4.)  Defendants argue that a *Bivens* remedy has not been

recognized in any of the contexts presented by Plaintiffs' claims.  (Def. Mem. 12–13.)

    Although the Supreme Court and other courts have extended the *Bivens* remedy to

particular claims alleging Fifth Amendment due process violations, the remedy has not been

extended to all claims asserting due process violations.  *FDIC v. Meyer*, 510 U.S. 471, 484 n.9

(1994) ("[A] *Bivens* action alleging a violation of the Due Process Clause of the Fifth

Amendment may be appropriate in some contexts, but not in others." (comparing *Davis*, 442 U.S

at 248–49 (*Bivens* remedy for gender discrimination claim arising under Due Process Clause)

with *Schweiker v. Chilicky*, 487 U.S. 412, 429 (1988) (no *Bivens* remedy for due process claim

based on the denial of Social Security benefits))).  Moreover, construing "context" to refer to any

and all claims asserting due process violations would be inconsistent with the Second Circuit's

definition of context, which requires consideration of whether the claim presents similar legal

*and* factual components to a claim that has been previously afforded *Bivens* relief.  *Arar*, 585

F.3d at 572 (construing "context" as "reflect[ing] a potentially recurring scenario that has similar

legal and factual components").  Because the Court is not aware of any case law allowing *Bivens*

relief to claims with "similar legal and factual components" as those asserted by Plaintiffs — and

Plaintiffs have not cited any such case law — the Court finds Plaintiffs' claims to be "new

contexts."  The Court must therefore decide whether to extend *Bivens* to these "new contexts."

    **ii.  Extending *Bivens* remedy**

    Defendants argue that application of the *Bivens* two-part test precludes relief for

Plaintiffs' claims.  According to Defendants, the Contract Disputes Act of 1978 ("CDA"), is a

comprehensive statute governing Plaintiffs' claim arising out of the Bus Contract, and is a

"special factor[] counseling hesitation" against a *Bivens* remedy for Plaintiffs' claim of non-

payment for the use of Plaintiffs' bus ("Bus Claim"). (*Id*. at 13–14.) Defendants also argue that Plaintiffs can avail themselves of the APA to address Plaintiffs' claims based on (1) the CVE Removal Decision — the decision by the CVE to remove A1 from the VIP database, (2) the Reconsideration Decision — the denial of Plaintiffs' request for reconsideration of the CVE Removal Decision, and (3) the Debarment. (Def. Mem 14–16.) Applying the *Bivens* two-part test, for the reasons explained below, the Court declines to extend *Bivens* remedies to any of Plaintiffs' claims.

### 1. Plaintiffs' Bus Claim

Defendants argue that Plaintiffs' Bus Claim cannot be remedied under *Bivens* because of the "comprehensive, remedial" scheme available to Plaintiffs under the CDA. Defendants assert that "the CDA contains a 'complex procedural and substantive framework' for disputes arising out of government contracts" which governs Plaintiffs' claim for nonpayment under the Bus Contract. (Def. Mem 14 (citing *Snell*, 712 F.3d at 668, 673–74).) Plaintiffs argue that because Defendants' nonpayment under the Bus Contract was due to the Debarment — and not the result of a contractual dispute — the CDA does not preclude a *Bivens* claim. (Pl. Opp'n 21.)

The first prong of the *Bivens* two-part test requires a court to consider whether there is an alternative existing process governing Plaintiffs' claim. *Wilkie*, 551 U.S. at 550. Specifically, the Court must determine "if the conduct at issue already is 'governed by comprehensive procedural and substantive provisions [of law] giving meaningful remedies against the United States.'" *Snell*, 712 F.3d at 671–72 (quoting *Bush*, 462 U.S. at 368). If there is an alternative existing process, "it is inappropriate for courts to supplement that regulatory scheme with a new judicial remedy." *Id*. A court cannot create a new judicial remedy even if the alternative existing process does not provide complete relief. *Id*. ("The fact that such a remedial scheme

does not provide complete relief for the plaintiff warrants no different conclusion" in precluding a *Bivens* remedy. (quoting *Bush v. Lucas*, 462 U.S. at 388) (internal quotation marks omitted)). In addition, even if the challenged conduct is motivated by illegitimate reasons, a court nevertheless cannot create a new judicial remedy where there is an alternative existing process for adjudication of the questioned conduct. *Id.* ("Nor will allegations of illegitimate motives support recognition of a *Bivens* claim for conduct subject to a comprehensive remedial scheme." (citations and internal quotation marks omitted)).

The Second Circuit has recently determined that constitutional claims arising out of government contracts cannot be remedied under *Bivens* because these types of claims are governed by the CDA. *Snell*, 712 F.3d at 675.[10] "Where it applies, the CDA is the exclusive remedy for a dispute against federal government agencies." *10-1 Indust. Assocs. v. U.S. Postal Serv.*, 133 F. Supp. 2d 194, 195 (E.D.N.Y. 2001); *see Snell*, 712 F.3d at 672 ("[T]he CDA afford[s] meaningful — and exclusive — remedies against the United States" for claims originating in contractual obligations.). The CDA applies generally "to any express or implied contract . . . for (1) the procurement of property . . . ; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the

---

[10] *M.E.S., Inc. v. Snell* represented the first time that the Second Circuit considered whether the availability of relief under the CDA precludes a *Bivens* claim. *M.E.S., Inc. v. Snell*, 712 F.3d 666, 668 (2d Cir. 2013). In *Snell*, the Second Circuit noted that two other circuit courts had previously considered the issue and both concluded that "the statute's complex procedural and substantive framework is comprehensive, precluding *Bivens* claims by aggrieved government contractors that relate to or derive from contract disputes." *Id.* (citing *Evers v. Astrue*, 536 F.3d 651, 657 (7th Cir. 2008) and *Janicki Logging Co. v. Mateer*, 42 F.3d 561, 56–65 (9th Cir. 1994)). The Second Circuit also noted that district courts appear "uniformly to have reached the same conclusion." *Id.* at 669 (collecting cases from the Southern District of New York, District of Idaho, District for the District of Columbia, Northern District of Illinois, and the Eastern District of Louisiana).

disposal of personal property." 41 U.S.C. § 7102(a).[11]  It also provides for "persons aggrieved in

connection with [any express or implied contract under the CDA] to submit 'each claim against

. . . the Federal Government' to a contracting officer."  *Snell*, 712 F.3d at 672 (quoting 41 U.S.C.

§ 7103(a)(1–2)) (alteration in original); *Champagne v. United States*, 15 F. Supp. 3d 210, 219–20

(N.D.N.Y. 2014) (citing *Snell*, 712 F.3d at 672).  The contracting officer's decision "is final and

conclusive and not subject to review in any forum, tribunal, or Federal Government agency,

except as authorized by the CDA itself."  *Snell*, 712 F.3d at 672–73 (citations and internal

quotation marks omitted).  The Second Circuit has described the CDA as "the paradigm of a

precisely drawn, detailed statute which purports to provide final and exclusive resolution of all

disputes arising from government contracts that fall within its ambit."  *Id.* at 673.  Jurisdiction

over these claims is limited to the Court of Federal Claims.  *Id.* at 672 ("In conferring original

jurisdiction on federal district courts to hear civil claims against the United States, Congress

expressly excluded 'any civil action or claim against the United States founded upon any express

or implied contract with the United States' that is subject to review under the CDA.").

In determining whether Plaintiffs' Bus Contract claim is governed by the comprehensive

scheme of the CDA, and thus, inappropriate for a *Bivens* remedy as proclaimed by the Second

Circuit in *Snell*, the Court considers the "source of the rights" on which Plaintiffs base their

claim and "the type of relief sought (or appropriate)."  *See Up State Federal Credit Union v.*

*Walker* ("*Up State*"), 198 F.3d 372, 375 (2d Cir. 1999).  A claim is contractual, and thus subject

to the CDA, if the right the plaintiff seeks to vindicate stems from a contract, "and the remedy

---

[11]  The CDA was amended by the Tucker Act, 28 U.S.C. §§ 1346, 1491.

for violating that right is a 'contractual remedy.'[12] *Champagne*, 15 F. Supp. 3d at 221.  The first part of this two-prong test, considering the "source of the rights" forming a plaintiff's claim, is focused on determining the basis for the claim — that is, whether the plaintiff's rights would have existed in the absence of a contract.  *See Up State*, 198 F.3d at 377 (finding that the plaintiff asserted a contract claim as "adjudication of this dispute requires an interpretation of the [contract]"); *Champagne*, 15 F. Supp. 3d at 221 (concluding that the plaintiff's claims, allegedly sounding in tort, were actually contract claims after finding that "none of the facts alleged . . . implicate any duty outside the contractual relationship between the government and the plaintiff); *Kielczynski v. U.S. Cent. Intelligence Agency*, 128 F. Supp. 2d 151, 160–61 (E.D.N.Y. 2001) (finding that the plaintiff's putative due process claim was based in contract as "the very existence of the alleged due process claim hinge[d] on the existence of a contract").  The second-prong under this test examines "the type of relief sought (or appropriate)."  *Up State*, 198 F.3d at 375.  Under this prong, "monetary damages are generally considered 'contractual,'" for the purposes of the CDA.  *Atterbury*, 2014 WL 3392725, at *12 (explaining that while "[c]ertain types of remedies, such as equitable relief, are generally beyond the Court of Federal Claims' jurisdiction . . . . the [Contract Disputes Act] does authorize the Court of Federal Claims to award monetary damages").  However, a "classic contractual remedy" generally encompasses

---

[12]  The Second Circuit in *Up State Federal Credit Union v. Walker ("Up State")*, 198 F. 3d 372, 375 (2d Cir. 1999), and district courts within this Circuit, have uniformly applied the source and remedy test in considering which claims are subject to the CDA, and which are not. *See Up State*, 198 F.3d at 375 ("[T]he determination of whether an action is 'at its essence a contract action . . . depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought . . . .'" (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982))); *Cohen v. Postal Holdings, LLC*, No. 14-CV-800, 2015 WL 225051, at *2 (D. Conn. Jan. 15, 2015) (same); *Champagne*, 15 F. Supp. 3d 210, 221 (N.D.N.Y. 2014) (same); *Atterbury v. United States Marshal Serv.*, No. 12-CV-502, 2014 WL 3392725, at *11 (W.D.N.Y. July 10, 2014) (same); *Kielczynski v. U.S. Cent. Intelligence Agency*, 128 F. Supp. 2d 151, 159−61 (E.D.N.Y. 2001) (same).

damages that will "place [a plaintiff] in roughly the same position that he would have been in had the contract been properly performed." *Id*.; *see Kielczynksi v. Does 1–2*, 56 F. App'x 540, 541 (2d Cir. 2003) (affirming *Kielczynski*, 128 F. Supp. 2d 151, and finding that "[a]ppellant's claims, however styled, primarily seek recovery of money damages, and are, under this Court's current standard, essentially contract claims against the United States . . . . [a]s such, the [Contract Disputes Act] . . . provides the only source of relief for [a]ppellant); *see also Up State*, 198 F.3d at 377 (plaintiff's request for an order "analogous to a . . . [request] for specific performance" is a contractual remedy).

Here, Plaintiffs allege that after the Debarment, Eckenrode, Leney, the Supervisors of the CVE and John/Jane Does 1 –100 "expanded the conspiracy [against Plaintiffs] by instructing Defendant Vogt and Defendant Monteleone to keep Plaintiffs' para-transit bus . . . and refuse to pay the Plaintiffs for the bus in order to intentionally violate Plaintiffs' Fifth Amendment constitutional rights and to intentionally inflict emotional distress on the Plaintiffs."  (Sec. Am. Compl. ¶ 123.)  Plaintiffs argued at oral argument, and contend in their brief, that the Bus Contract claim does not arise out of a contractual dispute and is therefore not subject to the CDA, because the claim is constitutional and similar to claims recognized by courts in other circuits as not subject to the CDA.  Plaintiffs cite to a Federal Court of Claims case and district and circuit court cases from the District of Columbia:  *Ayres v. United States*, 66 Fed. Cl. 551, 560 (Fed. Cl. 2005); *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 4 (D.C. Cir. 1998) ("Commercial Drapery"); *Ervin & Assoc., Inc. v. Dunlap*, 33 F. Supp. 2d 1, 12 (D.D.C. 1997); *SRS Techs. v. United States*, 843 F. Supp. 740, 742 (D.D.C. 1994); *Ingersoll-Rand Co. v. United*

*States*, 780 F.2d 74, 77–78 (D.C. Cir. 1985)[13]; and *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The Court finds these cases to be distinguishable and/or otherwise unpersuasive, and further concludes after consideration of the "source" of Plaintiffs' Bus Contract claim and the remedies sought, that this claim is subject to the CDA, and *Bivens* relief is thereby precluded.

First, the Federal Court of Claims' decision in *Ayers* is distinguishable. In *Ayers*, the court found that the plaintiff's claim was not subject to the CDA because it involved a contract for the sale of real property, a claim that is specifically excluded from review under the CDA. 66 Fed. Cl. at 558 ("The Contract Disputes Act applies only to 'any express or implied contract entered into by an executive agency for — (1) the procurement of property, *other than real property in being*; (2) the procurement of services; (3) the procurement of constructions, alteration, repair or maintenance of real property; or (4) the disposal of personal property." (emphasis added) (citing 41 U.S.C. § 602)). At oral argument, Plaintiffs relied on *Ayers* for the proposition that "[c]laims for alleged wrongful conduct by governmental officials in their official capacity are tort claims over which [the Federal Court of Claims] does not have jurisdiction," and therefore *Bivens* relief from a district court is the appropriate recourse for such claims. However, *Ayers* clarifies that "'where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the exclusive jurisdiction

---

[13] Plaintiff's reliance on *Ingersoll-Rand Co. v. United States* is misplaced as the court in *Ingersoll-Rand* found in that case that the plaintiff's claim of wrongful termination and unlawful resolicitation of a government contract *was* subject to the CDA as a contractual dispute and thus, outside the jurisdiction of the district court. 780 F.2d 74, 77–81 (D.C. Cir. 1985) (finding, *inter alia*, that "it is possible to conceive of [the parties'] dispute as entirely contained within the terms of the contract," plaintiff's claim was "within the unique expertise of the Court of Claims" since it called for knowledge of the government contracting process and that the "essence" of plaintiff's claim was a request for specific performance, a contractual remedy resolvable by the Federal Court of Claims under the CDA).

of the [United States] Court of Federal Claims.'" *Ayers*, 66 Fed. Cl. at 558 (quoting *Awad v. United States*, 301 F.3d 1367, 1372 (Fed. Cir. 2002)) (alteration in original).

As to the remaining District of Columbia circuit and district court cases relied upon by Plaintiffs, those courts found the claims at issue to be, at their essence, constitutional tort claims, not contract claims, after considering the source of the rights asserted by the plaintiffs and the relief requested. *See Commercial Drapery*, 133 F.3d at 4 (finding that claim based on the termination of a government contract was not "at its essence" a contract action because the basis of the claim was that a government agency made repeated attempts to "extricate the government from financial dealings" with plaintiffs and plaintiffs sought only equitable relief and not damages for breach of contract); *Dunlap*, 33 F. Supp. 2d at 11–12 (finding that plaintiff's claims, which did not seek monetary damages, "are less 'breach of contract' claims . . . than they are claims that the government is using its contracting power as a means to retaliate against him" and are thus within the jurisdiction of the district court); *SRS Techs.*, 843 F. Supp. at 742–43 (holding that the district court had jurisdiction because, among other things, the claim did not challenge whether the governmental agency violated some contractual provision but whether it violated its own regulations which were never incorporated into the contract, plaintiff did not invoke any contractual provision to claim breach of contract, and as plaintiff lacked any contractual claim, it could not collect damages in the Court of Federal Claims), *Megapulse*, 672 F.2d at 968–70 (finding that the plaintiff's claims against the government were not "disguised contract claims," noting that plaintiff did not claim a breach of contract and sought no monetary damages).

Here, having considered the source of the Plaintiffs' right to payment — the Bus Contract — and the remedy sought — monetary damages for non-payment under the Bus Contract — the Court finds both to be contractual. First, although Plaintiffs have styled their

claim as a violation of their "procedural and substantive due process rights" relating to the Debarment, Plaintiffs are complaining of Defendants' failure to pay Plaintiffs in violation of the Bus Contract, seeking to vindicate a right stemming from a contract. (Sec. Am. Compl. ¶ 123 (alleging that Defendants "intentionally violate[d] Plaintiffs' Fifth Amendment constitutional rights" by refusing to pay Plaintiffs for their para-transit bus)). Without the Bus Contract, Defendants would have no obligation to pay Plaintiffs, and by extension, Plaintiffs would have no "due process" claims. The allegations in the Second Amended Complaint support this conclusion, confirming that the obligation to pay Plaintiffs derive from the Bus Contract. (*See* Sec. Am. Compl. ¶¶ 125 (alleging that "Defendant Vogt stated that he would not pay out on the para-transit bus contract, until D.C. counsel — Defendant Foley — approved it."), 126 (alleging that the "VA's failure to pay Plaintiffs' for the para-transit bus *contract . . .* violate[s] Plaintiffs' due process rights (emphasis added)); *see also* Sec. Am. Compl. Exs. 34–36 (discussing payment to Plaintiffs for the use of the bus referring to "[B]us [C]ontract" or "lease"). Thus, the "source" of Plaintiffs' Bus Contract claim is clearly contractual. *See Kielcynski*, 128 F. Supp. 2d at 160–61 (finding that plaintiff's putative due process claim was *based* in contract as "the very existence of the alleged due process claim hinge[d] on the existence of a contract"). In addition, Plaintiffs have repeatedly requested monetary damages under the Bus Contract, (*see* Sec. Am. Compl. ¶¶ 125–126 (allegations related to Plaintiffs' requests for payment)), which are contractual remedies, for Defendants' nonpayment. *See Atterbury*, 2014 WL 3392725, at *12 ("[M]onetary damages are generally considered contractual [remedies]."). Plaintiffs' claim is thus a contract claim.[14]

---

[14] Plaintiffs' characterization of the Bus Claim as constitutional claim rather than as a contractual claim is not determinative of what the claim is. *See B&B Trucking, Inc. v. U.S.*

24

Plaintiffs also claimed at oral argument that the Debarment notice by its very terms terminated the Bus Contract, making the Bus Claim an issue of "unconstitutional debarment" and not a failure-to-pay contractual issue. Even assuming, as Plaintiffs claim, that the "unlawful" Debarment is the reason for Defendants' nonpayment under the Bus Contract, there are no allegations in the Second Amended Complaint that Plaintiffs' right to payment was based on their participation in the VIP database (denied to Plaintiffs by the Debarment) such that their non-participation in the VIP database, or Debarment from government contracts, could be considered the *source* of their right to payment under the Bus Contract.[15] As both the source of Plaintiffs' rights, and the remedy sought, in connection with the Bus Contract are contractual in nature, Plaintiffs' Bus Claim is governed by the CDA. *See Snell*, 712 F.3d at 674 (applying source and remedy test to claim that defendants violated constitutional rights by terminating

_____

*Postal Serv.*, 406 F.3d 766, 768 (6th Cir. 2005) ("The plaintiff's title or characterization of its claims is not controlling. [A] plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions." (alteration in original) (citation and internal quotation marks omitted)); *Champagne*, 15 F. Supp. 3d at 222–23 (finding that the plaintiff's claims, while characterized as sounding in tort, were contractual because "none of the facts . . . implicate any duty outside the contractual relationship between the government and the [p]laintiff . . . . [and] the damages that [p]laintiff seeks are damages that could only come as a result of lost payments under the contract"); *Kesler Enters., Inc. v. U.S. Dep't of Agriculture*, No. 10-CV-169, 2010 WL 4641360, at *4 (D. Idaho Nov. 4, 2010) ("The Court is persuaded that when Congress indicated that 'all claims by a contractor against the government relating to a contract' were to be resolved according to the CDA, it meant precisely that— 'all claims.' Any other view has the potential for abuse. It would be a simple exercise for contractors to covert a contract claim into a constitutional one by simply characterizing as unconstitutional the contracting officers motivation for the termination or su[s]pension of a contract."); *see also Snell*, 712 F.3d at 674–75 (holding that the plaintiff's "*Bivens* claim that government officials violated constitutional rights when they . . . terminat[ed] . . . government contracts" was subject to the CDA, and thus inappropriate for *Bivens* relief).

[15] To the extent that Plaintiffs' are asserting that the Bus Claim is merely a subset of their Debarment claim, as discussed *infra* Part II.b.ii.2, the Court declines to extend *Bivens* relief to Plaintiffs' Debarment claim.

government contracts and finding it governed by CDA precluding a *Bivens* claim); *Evers v. Astrue*, 536 F.3d 651, 661 (7th Cir. 2008) (noting that substantive due process claim based on allegations that defendants committed "administrative tyranny" by terminating government contract is "really just a histrionic way of arguing [defendants] committed a breach of contract"); *see also Aryai*, 25 F. Supp. 3d at 396–98 (finding that although plaintiff had no redress under the CDA as an *employee* of a government contractor, "the CDA represents a comprehensive attempt to regulate the Government's conduct with respect to its contractors such that recognizing a *Bivens* action to redress violations . . . [raised by] those contractors' employees . . . would interfere with Congress' purposeful policy . . . ."). Following *Snell*, because the comprehensive, remedial scheme afforded to Plaintiffs under the CDA constitutes an "alternative, existing process for protecting"[16] Plaintiffs' interests in the Bus Contract, the Court declines to extend *Bivens* and dismisses this claim.[17]

### 2. CVE Removal Decision, Reconsideration Decision and Debarment claims

Defendants argue that the "APA provides [Plaintiffs] a right to seek judicial review" of (1) the CVE Removal Decision, (2) the Reconsideration Decision, and (3) the Debarment, (Def.

---

[16] Although Defendants appear to argue that Plaintiffs' Bus Contract claim should be dismissed under the second prong of the *Bivens* test (*see* Def. Mem. 13) — whether there are "special factors" counseling hesitation in creating a *Bivens* remedy — the Court dismisses Plaintiffs' Bus Claim as precluded by the CDA under the first prong of the *Bivens* test. This approach is consistent with the Second Circuit's approach in *Snell*. *See Snell*, 712 F.3d at 671−73.

[17] It is unclear whether preclusion of a *Bivens* claim because of the CDA warrants dismissal under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of jurisdiction, or Rule 12(b)(6) for failure to state a claim. *Snell*, 712 F.2d at 671 (citing cases and declining to decide the question "as the result would be the same under either approach"). The Court declines to decide the issue for the same reasons the Second Circuit declined to do so in *Snell*.

Mem 15), and because the APA constitutes an "alternative, existing process," it precludes a *Bivens* claim and these three claims should all be dismissed. (Def. Mem. 14). Plaintiffs argue that as a general matter, the APA does not bar a *Bivens* claim "where money damages are appropriate or where there is an interest in deterring improper government conduct." (Pl. Opp'n 16.) Plaintiffs also argue that the APA should not preclude a *Bivens* claim in this case because the APA does not provide an adequate remedy. Plaintiffs contend, both in their written submission and at oral argument, that "the APA is incapable of providing retrospective compensation" and will not "deter Defendants from repeating their unconstitutional conduct because the Defendants do not face personal liability under the APA." (*Id.*) Plaintiffs also suggest that, because the Debarment was vacated, they have no recourse under the APA for any damages resulting from the Debarment under the APA as the APA only offers non-monetary relief. (*Id.* at 20.)

The APA provides in relevant part that, "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Its "comprehensive provisions . . . [also] allow any person adversely affected or aggrieved by agency action to obtain judicial review thereof, [if] the decision challenged represents a 'final agency action for which there is no other adequate remedy in court.'" *Webster v. Doe*, 486 U.S. 592, 599 (1988). The question of whether the availability of review under the APA precludes a *Bivens* claim has not been decided by the Second Circuit, but the Second Circuit has described the APA's scope as "broad" and "comprehensive." *Citizens Comm. for Hudson Valley v. Volpe*, 425 F.2d 97, 102 (2d Cir. 1970) ("There can be no question at this late date that Congress intended by the [APA] to assure comprehensive review of a broad spectrum of administrative actions." (citation and

internal quotation marks omitted)); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41 (1967) ("The legislative material elucidating [the APA] manifests a congressional intention that it cover a broad spectrum of administrative actions, and th[e] Court has echoed that theme by noting that the [APA]'s generous review provisions must be given hospitable interpretation." (citations and internal quotation marks omitted)), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Kirkwood v. Ives*, No. 11-CV-00210, 2011 WL 6148665, at \*4 (E.D. Ky. Dec. 9, 2011) ("The APA is, by its nature, very broad in scope; absent some statutory or other exception, the APA's comprehensive provisions provide the backup or default remedies for all interactions between individuals and all federal agencies.").

The Ninth Circuit and several district courts have considered whether the availability of review under the APA precludes a *Bivens* claim, and, with one exception, have found that the APA constitutes an alternative, existing process precluding *Bivens* remedy. *See W. Radio Servs. Co. v. U.S. Forest Serv.* ( *"Western Radio"*), 578 F.3d 1116, 1122 (9th Cir. 2009) ("[T]he design of the APA raises the inference that Congress 'expected the Judiciary to stay its *Bivens* hand' and provides 'a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" (quoting *Wilkie*, 551 U.S. at 554); *Montgomery v. Sanders*, No. 07-CV-470, 2011 WL 6091802, at \*6 (S.D. Ohio Dec. 7, 2011) ("The APA leaves no room for *Bivens* claims based on agency action or inaction."), *vacated in part on other grounds*, 2013 WL 1149240 (S.D. Ohio Mar. 19, 2013); *Reunion, Inc. v. FAA*, 719 F. Supp. 2d 700, 709–10 (S.D. Miss. 2010) (dismissing *Bivens* claim in part because the APA provided review and remedies for the plaintiff's claims). *But see Navab-Safavi v. Broad. Bd. of Governors*, 650 F.

Supp. 2d 40, 67 n.13 (D.D.C. 2009) (finding that the APA does not constitute an alternative process precluding *Bivens* claim).[18]

The Court agrees with the courts that have considered this issue and finds that there is no *Bivens* remedy for a claim that is within the ambit of the APA, as the APA constitutes an alternative, existing process for relief. The Court agrees with the reasoning of the courts that have also reached this conclusion that the sheer breadth and comprehensiveness of the APA counsels against the judicial creation of a separate remedy as doing so would supplant Congress' intent for the *APA* to redress claims arising out of agency action and inaction. *See Western Radio*, 578 F.3d at 1123 (The APA's breadth "indicates Congress's intent that courts should not devise additional, judicially crafted default remedies."); *Jarita Mesa Levestock Grazing Ass'n v. U.S. Forest Serv.*, 921 F. Supp. 2d 1137, 1191 (D.N.M. 2013) ("The 'statutory language' of the APA evidences a congressional intent for claims such as Plaintiffs . . . to be brought under the APA, and not in a suit under *Bivens*."); *Montgomery*, 2011 WL 6091802, at *7 ("The design of the APA raised the inferences that Congress expected the Judiciary to stay its *Bivens* hand . . . ."

---

[18] *Navab-Savari v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009) is factually distinguishable and therefore, not applicable. In *Navab-Savari*, the court considered whether the CDA or the APA qualified as "special factors counseling against the recognition of *Bivens* remedies for plaintiff's claims" under the second prong of the *Bivens* test. In reaching its conclusion that the APA does not preclude the availability of a *Bivens* remedy involving an employment issue, the court noted that the case was "not the paradigmatic APA case where a claimant with an arm's length relationship to the agency seeks to challenge a decision made as a disinterested exercise of the sovereign's regulatory powers." *Id*. at 69. Rather, the plaintiff in *Navab-Savari* was a member of the agency's workforce challenging agency action as it related to her *employment*. *Id*. The court determined that "no statute," including the APA "specifically addresse[d] the substance" of plaintiff's employment relationship. *Id*. By contrast, here, there are regulations specifically governing Plaintiffs' claims arising from the CVE Removal Decision, the Reconsideration Decision and the Debarment. *See* 38 U.S.C. § 8127(f) (governing eligibility for SDVOSB status); 38 C.F.R. § 74.1 *et seq*. (regulations for administration of CVE's VIP database); 48 C.F.R. § 809.406.2 (regulations regarding debarment). Compliance, or lack of compliance, with these regulations can be reviewed under the APA.

(quoting *Western Radio*, 578 F.3d at 1123) (internal quotation marks omitted)).  Under these circumstances, and consistent with the Supreme Court and Second Circuit mandate that courts should not allow *Bivens* claims where there is an alternative, existing process for protecting the interests at issue,[19] the Court "decline[s] to infer substantive legal liability without legislative aid, mindful that Congress is in a better position to decide whether or not the public interest would be served by creating it."  *Snell*, 712 F.3d at 672 (citing *Lucas*, 462 U.S. at 390).

Rather than challenge the applicability of the APA to their claims, Plaintiffs argue that the relief available under the APA is insufficient because it does not provide "retrospective compensation" and they should be afforded *Bivens* relief.  Contrary to Plaintiffs' argument, the fact that they will not receive monetary damages, or "retrospective compensation," under the

---

[19]  Plaintiffs do not contest the applicability of the APA to their claims related to the CVE Decision, Reconsideration Decision, and Debarment.  (*See* Sec. Am. Compl. ¶¶ 173–83 (seeking agency review and equitable relief under the APA).)  The APA's comprehensive scheme does include the right of review of agency decisions made pursuant to various VA regulations, such as the regulations at issue here.  For example, the CVE Removal Decision and the Reconsideration Request regarding Plaintiffs' removal from the VIP database, are governed by 38 C.F.R. § 74.1 *et. seq*, compliance (or lack of compliance) with which is reviewable under the APA.  38 C.F.R. § 74.1 (setting forth guidelines of CVE's VIP database); *see also Gonzales-McCaulley Inv. Group v. U.S. Dep't of Veterans Affairs*, No. 13-CV-6877, 2014 WL 2937939 (C.D. Cal. June 30, 2014) (reviewing, pursuant to the APA, the VA's denial of plaintiff's VIP application for compliance with 38 C.F.R. § 74.1 *et seq.*); *CS-360, LLC v. U.S. Dep't of Veterans Affairs*, 846 F. Supp. 2d 171, 185 (D.D.C. 2012) (same).  Similarly, the Debarment was issued pursuant to 38 U.S.C. § 8127 and 48 C.F.R. § 809.406-2 and is therefore reviewable pursuant to the APA.  48 C.F.R. § 809.406-2 ("Misrepresentation of VOSB or SDVOSB eligibility may result in action taken by VA officials to debar the business concern.")  Indeed, Plaintiffs acknowledge in the Second Amended Complaint that these claims are governed by various VA regulations.  (*See* Sec. Am. Compl. ¶¶ 45 ("The Defendants unlawful removal of A1 from the VIP database violated Plaintiffs' procedural and substantive due-process rights . . . because Defendants did not adhere to mandatory VA regulations or substantive law in removing A1 from the VIP database"); 47 ("The CVE's conclusion that A1 was not controlled by Mr. Storms was . . . contrary to VA regulations."); 62 (the CVE failed to render a decision on Plaintiffs' reconsideration request "in intentional and direct violation of 38 C.F.R.§ 74.13(b)"); 80 (Defendants "intentionally refused to adhere to" 38 U.S.C. § 8172 and VAAR 809.406).)

APA does not warrant a different conclusion. The Supreme Court has expressly rejected this

argument.[20] *See Chilicky*, 487 U.S. at 421–22. ("[T]he absence of statutory relief for a

---

[20] Plaintiffs rely on *Minneci v. Pollard*, 565 U.S. at ---, 132 S. Ct. 617, 625 (2012), for the proposition that "the APA does not bar *Bivens* when money damages are appropriate or when there is an interest in deterring improper government conduct." (Pl. Opp'n 16.) The Court finds Plaintiffs' reliance on *Minneci* misplaced. The Supreme Court in *Minneci* considered whether to extend *Bivens* relief to an Eighth Amendment claim against a private defendant in light of the fact that there were alternative remedies available to plaintiff under state tort law. *Minneci*, 565 U.S. at ---, 132 S. Ct. at 620. In holding that *Bivens* relief was not appropriate for the plaintiff's claim, the Court considered whether state tort law remedies provided similar incentives for compliance with the Eighth Amendment and similar compensation as a remedy under *Bivens*. *Id.* at 625. Concluding that it did not, the Supreme Court declined to extend relief under *Bivens* to the plaintiff's claims. *Id.* Here, Plaintiffs argue that the Supreme Court's consideration in *Minneci* of whether remedies under state tort law provide similar incentives for compliance and similar compensation as a remedy under *Bivens*, requires courts evaluating *all* alternative remedies for relief to also consider these two issues, and if a court finds these factors to be lacking, the court shall impose a remedy under *Bivens*. The Court does not find *Minneci* to be as expansive as Plaintiffs contend. Because *Minneci* was concerned with the availability of relief under state tort law, and not the availability of relief under a congressionally-enacted statute, as is the case here, the Court does not find its analysis controlling. Unlike a remedy created under state tort law, the APA evinces congressional intent and the Court is obligated to defer to the remedy created (or omitted) pursuant to that intent. *Chilicky*, 487 U.S. at 429 (where Congress has designed a comprehensive system addressing a claim, even if it does not provide a full remedy, the court has "no legal basis . . . to revise its decision"); *Dotson*, 398 F.3d at 160 ("[F]ederal courts will generally not attempt to supplement the relief afforded by [congressional] statute through other actions, including those implied under *Bivens*."). Indeed, post-*Minneci*, the Second Circuit has reiterated this obligation in finding that the CDA, although it did *not* provide complete relief for plaintiffs, precluded a remedy under *Bivens*. *Snell*, 712 F.3d at 674–75.

Moreover, interpreting *Minneci* as Plaintiffs ask the Court to do, conflicts with the Supreme Court's clear directive that "the absence of *statutory* relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages" under *Bivens*. *Chilicky*, 487 U.S. at 421–22; *see Dotson*, 398 F.3d at 166 ("*Chilicky* made clear that it is the overall comprehensiveness of the statutory scheme at issue, *not the adequacy of the particular remedies afforded*, that counsels judicial caution in implying *Bivens* actions." (emphasis added)). Had the Supreme Court intended to overrule this principle, which has been followed by the Second Circuit in *Snell* and *Dotson*, it would have done so clearly. The Court finds *Minneci* to stand for the proposition that while "*[s]tate-law* remedies and a potential *Bivens* remedy need not be perfectly congruent . . . the question is whether, in general *state tort law remedies* provide roughly similar incentives for potential defendants to comply with the Eighth Amendment while also providing roughly similar compensation to victims of violations," in determining whether to extend *Bivens*. 565 U.S. at ---, 132 S. Ct. at 625 (emphasis added); *see Engel v. Buchanan*, 710 F.3d 698, 705 (7th Cir. 2013) (acknowledging that "where Congress has

constitutional violation . . . does not by any means necessarily imply that courts should award money damages [under *Bivens*] against [those] responsible for the violation."); *Corr. Servs. Corp.*, 534 U.S. at 69 ("It does not matter . . . that the creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go undressed. So long as the plaintiff has an avenue for some redress, bedrock principles of separation of powers forecloses judicial imposition of a new substantive liability."); *Dotson*, F.3d at 167 ("[T]he absence of statutory relief for a constitutional violation is not sufficient, by itself for courts to imply a cause of action for money damages against the official causing the violation. (citing *Chilicky*, 487 U.S. at 421–22)); *Atterbury*, 2014 WL 3392725, at *9 (recognizing that dismissal of the plaintiff's *Bivens* claim "means that the [p]laintiff is likely left without a remedy for the constitutional violation he allegedly suffered"). As the Ninth Circuit has explained, "[w]ith respect to agency action and inaction, . . . Congress has considered the universe of harms that could be committed . . . and has provided what Congress believes to be adequate remedies." *Western Radio*, 578 F.3d at 1122. Accordingly, the Court dismisses Plaintiffs' constitutional claims based on the (1) CVE Removal Decision, (2) Reconsideration Decision, and (3) the Debarment under the first prong of the *Bivens* test, finding that the APA constitutes an alternative, existing process for the adjudication of these claims.

---

created an 'elaborate, comprehensive scheme' to address a certain kind of constitutional violation, *Bivens* will generally be unavailable even if the scheme leaves remedial holes" but "where the alternative remedies are *the product of state law*, they need not be 'perfectly congruent' with the *Bivens* remedy; rather, the question is whether the alternatives 'provide roughly similar incentives . . . while also providing roughly similar compensation'" (emphasis added)).

### c. Plaintiffs' RICO claim

The Second Amended Complaint alleges that the Individual Defendants "engaged in a continued and widespread pattern of criminal conspiratorial conduct against the Plaintiffs" and "destroyed Plaintiffs' businesses for personal gain." (Sec. Am. Compl. ¶ 185.) According to Plaintiffs, Defendants "conspired to, and made overt actions in furtherance" of several "conspiratorial acts," including denying A1's CVE application in bad faith, refusing to consider A1's Reconsideration Request, "[f]raudulently misrepresenting that they had not received A1's" Reconsideration Request, debarring Plaintiffs "without providing procedural and substantive due-process of law," "fraudulently misrepresenting the law in the Debarment notice" and in the Reconsideration Decision, and failing to pay Plaintiffs for leasing Plaintiffs' para-transit bus. (*Id*.) The Court dismissed Plaintiffs' RICO claim at oral argument for failure to allege two racketeering acts. The Court explains its decision here.

The RICO statute allows "'[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962 to sue for and recover treble damages and attorneys' fees.'" *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 149, 150 (2d Cir. 2014) (quoting 18 U.S.C. § 1964(c)) (alteration in original); *see MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 272 n.8 (2d Cir. 2011). In order to establish a RICO claim, a Plaintiff must plead "'(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'" *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 58 F. App'x 663, 665 (2d Cir. 2014) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *Lundy*, 711 F.3d at 119 (citations omitted); *see also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) ("To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or

property; and (3) that the injury was caused by the violation of Section 1962.'" (citations omitted)). The RICO conduct must be both the proximate and but for cause of the plaintiff's injury. *Lerner*, 459 F.3d at 283. In addition, a pattern of racketeering "must be adequately alleged in the complaint," *Spool*, 520 F.3d at 183 (citations, alteration and internal quotation marks omitted), and must consist of two or more predicate acts of racketeering, *Lundy*, 711 F.3d at 119.

Courts look with particular scrutiny at civil RICO claims, given RICO's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies. *See Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 166–67 (E.D.N.Y. 2010) ("Because of this likely powerful effect on potentially innocent defendants who face the threat of treble damages, and the concomitant potential for abuse of RICO's potent provisions, the court is aware of a particular imperative in cases such as the one at bar, to flush out frivolous [civil] RICO allegations at an early stage of the litigation."), *aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq.*, 443 F. App'x 582 (2d Cir. 2011); *Purchase Real Estate Grp. Inc. v. Jones*, No. 05-CV-10859, 2010 WL 3377504, at *6 (S.D.N.Y. Aug. 24, 2010) ("'In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants.' Accordingly, courts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress." (citations omitted)). Courts are "to ensure that 'RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering . . . courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.'" *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 443 (S.D.N.Y. 2004) (alteration in

original) (citations omitted); *see also Spool*, 520 F.3d at 184 ("Ordinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1)."); *Purchase Real Estate Grp.*, 2010 WL 3377504, at *6 ("[C]ourts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress."); *DLJ Mortg. Capital*, 726 F. Supp. 2d at 237 ("[I]f an alternate route to recovery is available, a putative RICO plaintiff must pursue it first."); *Curtis & Assocs.*, 758 F. Supp. 2d at 172–73 (holding that "plaintiffs' claims must be rejected because finding otherwise — and allowing malicious prosecution claims such as those attempted to be alleged here to suffice as RICO predicate acts — would lead to absurd results").

Defendants argue that Plaintiffs' cause of action under RICO should be dismissed for four reasons. First, Defendants argue that Plaintiffs have not properly pled a RICO violation because they failed to plead a predicate act of racketeering activity, violation of a criminal statute, or a RICO "enterprise." (Def. Mem. 26–28.) Second, Defendants argue that Plaintiffs' RICO claim is "predicated on an implausible allegation of conspiracy." (*Id.* at 28.) Third, Defendants contend that the APA and CDA, as more "narrowly-drafted statutes" than RICO, preempt any recovery under RICO. (*Id.* at 29–30.) Finally, Defendants argue that Plaintiffs failed to plead that each of the individual Defendants were personally involved in a RICO violation. (*Id.* at 30.) Because Plaintiffs failed to allege a pattern of racketeering activity consisting of two or more predicate acts of racketeering, the Court dismissed Plaintiffs' RICO claim on this ground and declines to consider Defendants' alternative arguments for dismissal.

Plaintiffs fail to allege two racketeering activities in the Second Amended Complaint. In an effort to avoid dismissal, Plaintiffs allege in their brief in opposition to Defendants' motion to dismiss, for the first time, that Defendants (1)"threaten[ed] and extort[ed] Plaintiffs," in violation

of 18 U.S.C.A. § 1951(a), and (2) "knowingly retain[ed] possession of a stolen vehicle that crossed interstate lines," in violation of 18 U.S.C. § 2313(a).  Because Plaintiffs cannot amend their pleadings through their motion papers in an effort to circumvent dismissal, the Court does not recognize these factual allegations.[21]  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178

---

[21]  Even if the Court were to recognize the allegations set forth in Plaintiffs' brief in opposition to the motion to dismiss, Plaintiffs still fail to sufficiently allege two racketeering activities.  The statement alleging "threat" and "extortion" referenced by Plaintiffs was made by Defendants in responding to an Order to Show Cause issued by the Court on February 13, 2013, stating that the "VA is presently considering whether to recommence debarment proceedings, and is refraining from ruling on the request for reconsideration pending that decision and any further debarment proceedings."  (Pl. Opp'n 48 (citing Sec. Am. Compl. Ex. 17 at 7).)  A singular statement by Defendants that the "VA is presently considering whether to recommence debarment proceedings, and is refraining from ruling on the request for reconsideration pending that decision and any future debarment proceedings against Plaintiffs," is insufficient to allege a violation of 18 U.S.C. § 1951.  18 U.S.C. § 1951, otherwise known as the "Hobbs Act," defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  *Sekhar v. United States*, 570 U.S. ---, ---, 133 S. Ct. 2720, 2723 (2013).  To establish extortion, a plaintiff must demonstrate that the person committing the act either "pursued or received 'something of value from' [the plaintiff] that [he] could exercise, transfer or sell."  *Scheidler v. Nat'l Org. of Women, Inc.*, 537 U.S. 393, 405 (2003); *Flores v. Osaka Health Spa, Inc.*, 474 F. Supp. 2d 523, 529 (S.D.N.Y. 2007); *see also United States v. Torres*, 703 F.3d 194, 201 n.9 (2d Cir. 2012) (noting that the Hobbs Act prohibits the extortion of "property," which the Supreme Court has defined as "something of value that can be exercise[d], transfer[ed] or s[old]" (citing *Scheidler*, 537 U.S. at 405)).

Plaintiffs have not sufficiently alleged that Defendants "pursued []or received something of value" from Plaintiffs.  *Scheidler*, 537 U.S. at 405 ("[W]e have construed the extortion provision of the Hobbs Act . . . to require not only the deprivation but also the acquisition of property . . . . [T]he Hobbs Act[] require[s] that a person must 'obtain' property from another party.")  Plaintiffs appear to allege that the "property" at issue in their RICO claim is this legal action and unspecified "business activities."  (Pl. Opp. 48 (alleging that Defendants' statement in the Order to Show Cause response to the Court "can plausibly be viewed as a threat against the Plaintiffs to get them to cease their legal action and business activities through fear of another sham debarment proceeding").)  However, Plaintiffs cannot base their extortion claim on this legal action and participation in the SVOSB database, because Defendants did not, and could not, "obtain" this property.  Though liability under the Hobbs Act does not require *physical* or *tangible* property, it does require "obtainable" property.  *See Sekhar*, 570 U.S. at ---,133 S. Ct. at 2726–2728 (noting that "property" has been used to denote tangible and intangible property and holding that plaintiff failed to state an extortion claim because the property at issue — a general counsel's "intangible property right to give his disinterested legal opinion to his client free of

(2d Cir. 1998) (rejecting claim raised for the first time in plaintiff's brief in opposition to the defendant's motion to dismiss); *United States ex rel. Siegel v. Roche Diagnostics, Corp.*, 988 F. Supp. 2d 341, 342 (E.D.N.Y. Dec. 30, 2013) (noting that "[p]laintiff may not amend his complaint through motion papers" (citation and internal quotation marks omitted)); *Lazaro v. Good Samaritan Hosp.*, 54 F. Supp. 2d 180, 184 (S.D.N.Y. 1999) (stating that "it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss"); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977) ("[A] party is not entitled to amend his pleading through statements in his brief." (citation and internal quotation marks omitted)). Accordingly, the Second Amended Complaint fails to allege a pattern of racketeering activity consisting of two or more predicate acts of racketeering and the Court dismissed Plaintiffs' RICO claim on this ground, without prejudice. The Court declines to consider Defendants' alternative arguments for dismissal.[22] To the extent Plaintiffs intend to

---

improper outside interference" — was not obtainable property); *see also Scheidler*, 537 U.S. at 404–405 (finding that protesters were not liable under the Hobbs Act when they "interfered with, disrupted, and in some instances completely deprived" plaintiffs' abortion clinics of their ability to run their business because they did not pursue or receive "something of value" from plaintiff that they would "exercise, transfer or sell"). Here, Defendants could not have "obtained" this legal action or Plaintiffs' business activities. Thus, Plaintiffs cannot base their RICO claim on this "extortion" allegation.

In addition, Plaintiffs cannot base their RICO claim on their allegation that Defendants terminated the Bus Contract by failing to pay Plaintiffs for their para-transit bus, thereby stealing the para-transit bus, and then "knowingly retaining" possession of the stolen para-transit bus in violation of 18 U.S.C. § 2313(a). (Pl. Opp'n 48–49.) As Plaintiffs admitted during the September 23, 2014 oral argument, the VA has restarted its payments to Plaintiffs for their para-transit bus, thereby defeating any allegations that the para-transit bus is stolen. *See* 18 U.S.C. § 2313(a) (proscribing, among other things, the receipt, possession, and concealment of "any motor vehicle . . . which has crossed a State . . . boundary after being stolen" with knowledge that the vehicle was stolen).

[22] At oral argument Plaintiffs asserted that the facts claimed in the Second Amended Complaint constitute "obstruction or perversion of justice," a predicate act under RICO. In attempting to specify this claim, Plaintiffs merely argued that the "debarments" constituted

continue to pursue a RICO claim against the Defendants, they are required to comply with the order that will be filed separately today requiring Plaintiffs to file a RICO case statement with any new RICO filing.

---

obstruction of justice. A violation of the federal obstruction of justice statute, 18 U.S.C. § 1503, can constitute a predicate act of racketeering activity. 18 U.S.C. § 1961(1) (identifying acts indictable under § 1503 as a racketeering activity). However, as Plaintiffs have not proffered any facts demonstrating how the "debarments" obstructed justice, the Court finds that Plaintiffs have not sufficiently alleged such a claim and dismisses any such claim. To allege a violation under 18 U.S.C. § 1503, Plaintiffs must allege "(1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so — that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Quattrone*, 441 F.3d 153, 170 (2d. Cir. 2005) (citation and internal quotation marks omitted). Though Plaintiffs allege that certain acts by the Defendants — in particular, the Reconsideration Decision — have occurred during the pendency of the instant litigation, there are no allegations that these acts were intended to influence this proceeding. Indeed, at oral argument, the entirety of Plaintiffs' obstruction of justice argument was that the Debarments violated certain federal regulations and were intended to inflict damages on Plaintiffs, not that any of the alleged acts by Defendants were intended to unlawfully influence this, or any other federal court proceeding.

Plaintiffs also claimed at oral argument that the Second Amended Complaint alleges intentional abuse of process as a predicate act. In particular, Plaintiffs pointed to paragraph 185, subsection "f" of the Second Amended Complaint which states that the Defendants "refus[ed] to implement critical recommendations from the [United States Government Accountability Office], lawmakers, veteran groups, and the media which would have prevented Plaintiffs' damages in an intentional abuse of power, intentional abuse of process, and corrupt acts designed to destroy Plaintiffs' businesses and livelihoods." (Sec. Am. Compl. ¶ 185(f).) The Second Amended Complaint also alleges that the Defendants "[f]raudulently misrepresent[ed] the law in the Debarment notice and request for reconsideration determination in an intentional abuse of power, intentional abuse of process, and corrupt acts designed to destroy Plaintiffs' businesses and livelihoods." (*Id.* ¶ 185 (e).) Even assuming, without deciding, that these allegations were sufficient to state an abuse of process claim, Plaintiffs cannot sustain a RICO claim with only one alleged act of racketeering activity. *See Vaughn v. Air Line Pilots Ass'n*, 377 F. App'x 88, 90 (2d. Cir. 2010) ([P]laintiffs must show that [the defendants] engaged in at least two predicate acts of racketeering activity."); *Weisshaus v. Mermelstein*, 94 F. App'x 869, 870 (2d Cir. 2004) (finding that plaintiff's civil RICO claim fails in part because she did not "sufficiently allege[] that the relevant defendants engaged in two or more acts constituting a pattern of racketeering activity"); *Powers v. British Vita, P.L.C.*, 57 F.3d 176 (2d Cir. 1995) ("In order to state a civil RICO claim, [the plaintiff] must initially allege two or more acts of "racketeering activity." (citing 18 U.S.C. §§ 1961(5), 1962(b))).

### d. Plaintiffs' tort claims

Plaintiff alleges claims of (1) intentional infliction of emotional distress and (2) negligence against Defendants.  Defendants argue that these tort claims should be dismissed for several reasons:  (1) Plaintiffs did not exhaust their administrative remedies[23]; (2) there is no private analog for Plaintiffs' claims; and (3) the claims are barred by 28 U.S.C § 2680(h), which exempts claims arising out of an "interference with contract rights" from the FTCA's waiver of sovereign immunity.  The Court dismisses Plaintiffs' tort claims for lack of subject matter jurisdiction because Plaintiffs' tort claims lack a private analogue.

The United States is generally immune from suit.  *See United States v. Bormes*, 568 U.S. ---, ---, 133 S. Ct. 12, 16 (2012) ("Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" (quoting *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992))).  Under the FTCA, "Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees while acting within the scope of their employment." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217 –18 (2008); *Kuhner v. Montauk Post Office*, No. 12-CV-2318, 2013 WL 1343653, at *2 (E.D.N.Y. Apr. 4, 2013); *Leogrande v. New York*, No. 08-CV-3088, 2013 WL 1283392, at * 13 (E.D.N.Y. Mar. 29, 2013); *Espinoza v. Zenk*, No. 10-CV-427, 2013 WL 1232208, at *4 (E.D.N.Y. Mar. 27,

---

[23] Defendants' argument that Plaintiffs did not exhaust their administrative remedies is moot.  At oral argument on September 23, 2014, the Court consolidated the instant action with the Batlle Action and deemed the Second Amended Complaint to have been supplemented with the April 7, 2014 letter from the VA denying Plaintiffs' administrative claim.  Plaintiffs' exhaustion requirement under the FTCA is therefore satisfied by the VA Denial Decision.  28 U.S.C. § 2675 (requiring that a plaintiff "present[] claim to the appropriate Federal agency" and receive a denial from the agency in writing before instituting an action against the United States for money damages for injury or loss of property or personal injury or death).

2013). However, "the government's waiver of immunity under the FTCA is to be strictly construed in favor of the government." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012).

The FTCA's waiver is subject to several exceptions, one of which waives sovereign immunity of the United States only "if a private person . . . would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Liranzo*, 690 F.3d at 85 (quoting 28 U.S.C. § 1346(b)(1)); *see also* 28 U.S.C. § 2674 ("The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances.") This requirement is known as the private analogue requirement. *Liranzo*, 690 F.3d at 83 (The FTCA's waiver of sovereign immunity "extends only to claims for which a private analogue exists — that is, the waiver extends only to claims that could be brought against a 'private individual under like circumstances.'" (quoting 28 U.S.C. § 2674)). In imposing the analogue requirement, "the FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees" by looking "to the state-law liability of private entities, not to that of public entities." *Id*. at 86 (citing *FDIC v. Meyer*, 510 U.S. 471, 478 (1994) and *United States v. Olson*, 546 U.S. 43, 46 (2005)); *see Carter v. United States*, 494 F. App'x 148 (2d Cir. 2012) ("To satisfy the private analogue requirement, the plaintiff must show that his claim is comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, . . . satisfy the necessary elements of that comparable state cause of action." (citation and internal quotation marks omitted)). The FTCA "does not waive sovereign immunity for claims against the government based on governmental 'action of the type that private persons could not engage in and hence could not be liable for under local law.'" *Liranzo*, 690 F.3d at 86 (quoting *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988)). Thus, regarding certain "governmental functions, the United

States cannot be held liable, for no private analog exists." *C.P. Chem. Co., Inc. v. United States*, 810 F.2d 34, 37 (2d Cir. 1987); *see Nakamura v. United States*, No. 10-CV-2797, 2012 WL 1605055, at *3 (E.D.N.Y. May 8, 2012) ("A court considers whether or not a private person analog[y] exists for the government conduct at issue . . . or whether the plaintiff is complaining of conduct governed exclusively by federal law or . . . conduct of a governmental nature of function that has no analogous liability in the law of torts." (internal citation and quotation marks omitted) (alteration in original)). For example, "quasi-legislative or quasi-adjudicative action by an agency of the federal government is action of the type that private persons could not engage in and hence could not be liable for under local law." *Id*. at 37−38 (citing *Jayvee Brand v. United States*, 721 F.2d 385, 390 (D.C. Cir. 1983); *see Figueroa v. United States*, 739 F. Supp. 2d 138, 141 (E.D.N.Y. 2010) ("Often, [an] action with no private analog falls into the category of either 'quasi-legislative' or 'quasi-adjudicative' action of an agency." (citing *Akutowicz v. United States*, 859 F.2d 1122, 1126 (2d Cir. 1988))). If there is no private analogue, the FTCA claim shall be dismissed. *See Carter*, 494 F. App'x at 150–51 (dismissing FTCA claim because plaintiff failed to satisfy private analogue requirement (citing *Akutowicz*, 859 F.2d at 1125)); *Klopp v. United States*, 131 F.3d 131, 131 (2d Cir. 1997) (unpublished table decision) (dismissing FTCA claim in part because plaintiff failed to meet private analogue requirement); *Akutowicz*, 859 F.2d at 1125–26 (dismissing FTCA claim because the plaintiff failed to satisfy private analogue requirement); *cf. Liranzo*, 690 F.3d at 95–97 (reversing district court's decision dismissing FTCA claim because plaintiff satisfied private analogue requirement).

Defendants argue that there is no private analogue for Plaintiffs' tort claims, which "arise from alleged violations of federal law in the process of determining eligibility to bid for, and obtain federal contracts." (Def. Mem. 35.) Plaintiffs contend that Defendants have

"recharacterized" Plaintiffs' claims. (Pl. Opp'n 44.) Plaintiffs argue that they have pled two tort

claims — intentional infliction of emotional distress and negligence — both of which are

recognized state tort claims and are thus within the ambit of the FTCA. (*Id*. at 44–46.) At oral

argument, Plaintiffs asserted that the individual Defendants acted with malice and that their

conduct was conscience-shocking, and therefore, pursuant to *Chen v. United States*, 854 F.2d

622 (2d Cir. 1988), they can state a claim for intentional infliction of emotional distress under the

FTCA.

Though Plaintiffs have characterized their tort claims as intentional infliction of

emotional distress and negligence claims, both of which are causes of action that are recoverable

against private individuals, the Court must look to the "conduct forming the basis of the claim

against the federal government" to determine whether there is an analogy that can be drawn

between that conduct and conduct "which could form the basis of a cause of action." *Figueroa*,

739 F. Supp. 2d. at 141 (citing *C.P. Chem. Co., Inc.*, 810 F.2d at 37).

Plaintiffs' negligence and intentional infliction of emotional distress claims are based on

allegations relating to the individual Defendants' actions in making the CVE Removal Decision,

the Reconsideration Decision, and the Debarment, all of which are based on the "quasi-

adjudicative action" of the VA, a function "of the type that private citizens could not engage in

and hence could not be liable for under local law." *Chen*, 854 F.2d at 626 (finding no private

analog for debarment claim where plaintiff's claims were all "grounded in alleged negligent and

willful violations of federal procurement regulations"); *see also Klopp*, 131 F.3d at 131 (finding

no private analogue for "alleged negligent violations of the ministerial duties of federal court

clerks") (unpublished opinion); *Saleh v. United States*, No. 12-CV-4598, 2013 WL 5439140, at

*9 (S.D.N.Y. Sept. 27, 2013) (finding no private analogue for denial of a green card and "FBI's

pressure" on plaintiff to become an informant); *Fiore v. Medina*, No. 11-CV-2264, 2012 WL 4767143, at *8 (S.D.N.Y. Sept. 27, 2012) (finding no private analogue for negligence claim based on failure to provide notice of prison rules and regulations); *Figueroa*, 739 F. Supp. 2d at 141–42 (finding no private analog for negligent issuance of a passport, noting that "[o]ften, action with no private analog falls into the category of either quasi-legislative or quasi-adjudicative action of an agency"); *Omoniyi v. Dep't of Homeland Sec.*, No. 10-CV-1344, 2012 WL 892197, at *8–9 (S.D.N.Y. Mar. 13, 2012) (finding no private analog in denying naturalization application).

No private individual or entity could be held liable for the conduct alleged here, which consists of alleged failures to adhere to regulations designed for the *governmental* administration of the VIP database and debarment procedures, and a failure to provide due process of law, a right secured against the government, not private entities.[24] *See Chen*, 854 F.2d at 626 ("[V]iolation of the government's duties . . . is action of the type that private persons could not engage in."); *Fiore*, 2012 WL 4767143, at *8 (finding no private analogue to prison regulations under New York law); *see also Art-Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1160 (D.D.C. 1985) (finding that an alleged violation of due process rights arising from the government's failure to abide by its own regulations is not remediable under the FTCA and noting "these constitutional rights are guaranteed under *federal* law, not local law"). Thus, the

---

[24] Contrary to Plaintiffs' contention at oral argument, the fact that Plaintiffs allege that the Defendants engaged in conscious-shocking conduct with malice is not determinative under *Chen*. The Second Circuit in *Chen* discussed malice in order to determine whether the plaintiff had stated a claim for prima facie tort under New York law, a cause of action which requires a showing that "malevolence is the sole motive for defendant's otherwise lawful act." *Chen v. United States*, 854 F.2d 622, 629 (2d Cir 1988). The *Chen* decision neither held nor suggested that allegations of malice are sufficient to meet the private analogue requirement under the FTCA.

decision is not whether Plaintiffs can factually prove their tort claims, but rather, whether these tort claims could be brought against a private party. Because Plaintiffs' claims could not be brought against a private party, the Court has no jurisdiction to adjudicate Plaintiffs' tort claims.

### e. Declaratory, injunctive and equitable relief

The Second Amended Complaint seeks a declaratory judgment, a temporary restraining order, preliminary and permanent injunctive relief, a review of agency action under the APA, and equitable relief against Defendants pursuant to the APA. (Sec. Am. Compl. ¶¶ 173–81.) In their opposition to Defendants' motion to dismiss the Second Amended Complaint, Plaintiffs also seek "a vacature of the unconstitutional de facto debarment (Reconsideration Decision)." (Pl. Opp'n 49.)

### i. Declaratory relief

Plaintiffs request a declaratory judgment finding that: (1) "the VA and the individual Defendants acted unlawfully in debarring the Plaintiffs;" (2) "Plaintiffs need not disclose the [D]ebarment when bidding on future federal government contracts;" and (3) the Reconsideration Decision was unlawful.[25] (Sec. Am. Compl. ¶ 183; Pl. Opp'n 49.) Defendants move to dismiss Plaintiffs' declaratory claims arguing that Plaintiffs' request for declaratory relief as to the

---

[25] The Court notes that Plaintiffs' request for declaratory relief in the Second Amended Complaint differs from their request in the opposition to Defendants' motion to dismiss. The Second Amended Complaint seeks a declaratory judgment "finding that the VA and the individual Defendants acted unlawfully in debarring the Plaintiffs and Plaintiffs need not disclose the [D]ebarment when bidding on future federal government contracts." (Sec. Am. Compl. ¶ 183.) In their opposition to Defendants' motion to dismiss, Plaintiffs request a declaration that "the Debarments were unconstitutionally issued." (Pl. Opp'n 49.) Plaintiffs appear to be referring to both the Debarment and the Reconsideration Decision in their opposition to Defendants' motion to dismiss, as they refer to the Reconsideration Decision elsewhere as a "de facto debarment." (*Id*. at 51.) In their opposition to Defendants' motion to dismiss, Plaintiffs do not refer to their request for a declaration that they are not required to disclose the Debarment in future bids with the government. The Court nevertheless considers this claim below.

Debarment is moot in view of the February 19, 2013 vacature of the Debarment, and that Plaintiffs' allegations regarding the unlawfulness of the Debarment are "incorrect on the merits." (Def. Mem. 40.)

The Declaratory Judgment Act provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  For the purposes of the Declaratory Judgment Act, "actual controversy" means "whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, or sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quoting *Maryland Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 95 (2d Cir. 2011).  "'[A] mere demand for declaratory relief does not by itself establish a case or controversy necessary to confer subject matter jurisdiction . . . .' [Rather] '[w]here the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed.'" *Mitskovski v. Buffalo & Fort Erie Pub. Bridge Auth.*, 415 F. App'x 264, 267 (2d Cir. 2011) (quoting *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994)).

Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants" under the Declaratory Judgment Act.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995); *Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, --- F. Supp. 3d ----, ----, 2014 WL 4928976, at *17 (S.D.N.Y. 2014); *see also Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357,

359 (2d Cir. 2003) ("Courts have consistently interpreted [the Declaratory Judgment Act's] permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear.").  The Second Circuit instructs district courts to consider certain prudential factors in determining whether to exercise their discretion to consider a declaratory judgment action:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; . . . (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] . . . (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (5) whether there is a better or more effective remedy."

*New York v. Solvent Chem. Co., Inc.*, 664 F.3d 22, 26 (2d Cir. 2011) (quoting *Dow Jones & Co., Inc.*, 346 F.3d at 359–60) (alterations in original).  In addition, because "declaratory relief is intended to operate prospectively," courts have found "no basis for declaratory relief where only past acts are involved."  *See Adirondack Cookie Co. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 94 (N.D.N.Y. 2012) (quoting *John Wiley & Sons, Inc. v. Visuals Unlimited, Inc.*, No. 11-CV-5453, 2011 WL 5245192, at *4 (S.D.N.Y. Nov. 2, 2011) (internal quotation marks omitted); *see also Mariah Re Ltd.*, --- F. Supp. 3d at ----, 2014 WL 4928976 at *18 ("[T]here is no basis for declaratory relief where only past acts are involved." (quoting *Lojan v. Crumbsie*, No. 12-CV-320, 2014 WL 411356, at *5 (S.D.N.Y. Feb 1, 2013))).

### 1.  Declaration that Debarment was unlawful

Defendants argue that Plaintiffs' request for declaratory relief related to the Debarment is moot in view of the February 19, 2013 vacature of the Debarment, and further argue, that, in any event, Plaintiffs' allegations regarding the unlawfulness of the Debarment are "incorrect on the

merits."[26]  (Def. Mem. 40.)  The Court finds that Defendants' voluntary vacature of the Debarment does not moot Plaintiffs' claim for declaratory relief.  However, consideration of the prudential factors enumerated by the Second Circuit to guide the Court's decision in determining whether to exercise its discretion over declaratory claims weighs against consideration of Plaintiffs' requested declaratory relief as to the Debarment.

## A.  Debarment request is not moot

"The mootness doctrine, which is mandated by the 'case or controversy' requirement in Article III of the United States Constitution, requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties."  *Catanzano v. Wang*, 277 F.3d 99, 107 (2d. Cir. 2001) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990)).  The Second Circuit applies a two-part test in determining mootness.  An issue is moot "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 54 (2d Cir. 2008) (citing *Granite State Outdoor Adver., Inc. v. Town of Orange, Conn.*, 303 F.3d 450,

---

[26] Because this is a motion to dismiss, the Court does not consider Defendants' argument that Plaintiffs' allegations regarding the lawfulness of the Debarment are "incorrect on the merits."  At this juncture, the Court's review must be limited to whether the Second Amended Complaint pleads "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Regarding the alleged unlawfulness of the Debarment, Plaintiffs claim, *inter alia*, that the Debarment was issued based on "multiple grounds" that were not included in the proposed debarment notices issued to Plaintiffs, as they were required to be.  (Sec. Am. Compl. ¶ 77.)  Defendants do not dispute this claim, as it appears that this was part of the reason the Debarment was vacated.  (See *id.* ¶ 82 (stating that Defendants have represented that the Debarment was vacated because it was partially based on incidents that were not specified in the proposed debarment notices and thus, Plaintiffs were not given an opportunity to respond to the charges prior to the Debarment).)  Because Plaintiffs have raised issues of fact as to whether Defendants properly notified Plaintiffs of the bases for their Debarment, Plaintiffs have sufficiently stated a claim for relief on this issue.

451 (2d Cir. 2002) (per curiam)). When a defendant claims that its voluntary cessation or compliance moots a case, the defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 568 U.S. ----, ----, 133 S. Ct. 721, 727 (2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.*, 528 U.S. 167, 190 (2000)).

Defendants have failed to make either showing under the two-part test. First, Defendants have not shown that "there is no reasonable expectation that the alleged violation will recur." *Catazano*, 277 F.3d at 107. As the Court explains *infra* Part II.e.ii, Plaintiffs' speculation that the alleged violation will reoccur is insufficient to confer standing. However, when considering whether a claim is moot, the "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 189 ("[T]here are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."). Defendants conclusory claim that Plaintiffs' declaratory relief is "moot, because the Debarment has been vacated," (Def. Reply Mem. 73), does not satisfy their heavy burden as it does not provide any indication as to whether the debarment could or would recur. *Already, LLC*, 568 U.S. at ----, 133 S. Ct. at 727 (noting that defendant "cannot avoid its 'formidable burden' by assuming" whether the wrongful behavior could recur) (citation omitted); *Friends of the Earth*, 528 U.S. at 189 (noting that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur").

Second, Defendants have not shown how any interim events have eradicated the effects of the Debarment. According to Plaintiffs, the Debarment, though vacated, has had "lingering effects" on Plaintiffs. (Sec. Am. Compl. ¶ 127.) The Debarment was included in A1's Contractor Performance Evaluation, and Plaintiffs were unable to register in the government's System for Award Management program because they are still listed as debarred. (*Id*. ¶¶ 127−28.) Plaintiffs allege that "[m]entioning the [D]ebarment is preventing Plaintiffs from obtaining employment and being awarded contracts, and continues to destroy Plaintiffs' reputations and livelihoods." (*Id.* ¶ 127.) Because Defendants have not demonstrated that "interim relief or events have completely and irrevocably eradicated the effects of" the Debarment, this issue is not moot. *See Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 110 (2d Cir. 2010) ("The voluntary cessation of allegedly illegal activity may render a case moot 'if . . . there is no reasonable expectation that the alleged violation will recur and . . . interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" (citing *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996))); *Babcock v. Frank*, 729 F. Supp. 279, 287 (S.D.N.Y. 1990) (noting that plaintiff may be entitled to declaratory judgment in harassment case even though chief perpetrator of sexual harassment was demoted and transferred and thus, "there [was] no reasonable expectation" that the violation would recur, in light of the fact that it could not "be said that interim relief or events" had eradicated the effects of her harassment).[27]

---

[27] In addition, the Court notes that during the course of this proceeding, Defendants have admitted that the VA was "considering whether to recommence debarment proceedings." (Sec. Am. Compl. ¶ 83.)

Having found that Plaintiffs' requested declaratory relief related to the Debarment is not moot, and thus, can be adjudicated, the Court evaluates the prudential factors to determine whether it *should* consider this relief.

## B. Evaluation of prudential factors

As described above, the Court's authority to adjudicate claims for declaratory relief is discretionary. Plaintiffs contend that the Second Circuit's test militates in favor of the Court considering their claim for declaratory relief, arguing that, "[b]ecause a practical likelihood of current and future reputational harm exists . . . a declaratory judgment may serve a useful purpose in clarifying or settling the legal issues involved and may offer relief from uncertainty." (Pl. Opp'n 52 (citations and internal quotation marks omitted).) Although Defendants have not presented any arguments as to whether, for prudential reasons, the Court should consider Plaintiffs' requested declaratory relief related to the Debarment, an evaluation of the prudential factors weighs against the Court considering this claim. Specifically, the Court finds that factors one, two, and five weigh against considering Plaintiffs' request for a declaratory judgment declaring the Debarment unlawful.

The first factor requires the Court to evaluate whether the requested judgment would serve a "useful purpose in clarifying or settling the legal issues involved." *Solvent Chem. Co., Inc.*, 664 F.3d at 26. Here, a declaration, alone, that the Debarment *was* unlawful would serve no useful purpose in settling the legal issues between the parties, and therefore does not weigh in favor of the Court exercising its discretion to consider Plaintiffs' declaratory judgment request. "A 'useful purpose' arises when a party knows of the possibility of a lawsuit in the future, but neither party has reached the stage of seeking a coercive remedy." *Chicago Ins. Co. v. Holzer*, No. 00-CV-1062, 2000 WL 777907, at *3 (S.D.N.Y. June 16, 2000) (citing *Great Amer. Ins. Co.*

*v. Houston Gen. Ins. Co.*, 735 F. Supp. 581, 584 (S.D.N.Y. 1990)); *see also Chiste v. Hotels.com L.P.*, 756 F. Supp 382, 407 (S.D.N.Y. 2010) ("The fundamental purpose of the Declaratory Judgment Act is to allow a plaintiff not certain of his rights to 'avoid accrual of avoidable damages' and to 'afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued.'" (quoting *United States v. Doherty*, 786 F. 2d 491, 498 (2d Cir. 1986)). The Court finds little purpose in issuing a declaration proclaiming that the Debarment, which is no longer in effect and was voluntarily vacated, was unlawfully issued. *See Chiste*, 756 F. Supp. 2d at 407 (finding that declaratory judgment would not serve any useful purpose because harm already occurred); *Nat'l Union Fire Ins. Co. v. Internat'l Wire Grp., Inc.*, 02-CV-10338, 2003 WL 21277114, at *5 (S.D.N.Y. 2003) (dismissing claim for declaratory relief and finding that declaratory judgment was unnecessary because plaintiff sought only a declaration of non-liability for past actions); *see also Great Amer. Ins. Co.*, 735 F. Supp. at 584 ("[T]he primary purpose of the [Declaratory Judgment Act] is to have a declaration of rights not already determined, not to determine whether rights already adjudicated were adjudicated properly." (alteration in original)).

The second factor is whether the judgment would "finalize the controversy and offer relief from uncertainty." *Solvent Chem. Co., Inc.*, 664 F.3d at 26. Because the Debarment is no longer an issue to be litigated between the parties, a declaration that the Debarment was unlawful would not offer any relief from uncertainty, nor any conclusion to the issues between the parties. In fact, Plaintiffs contend that Defendants have admitted that the Debarment was imposed improperly,[28] thus there appears to be no uncertainty as to the propriety of the Debarment. The

---

[28] Defendants stated in a submission to the Court that "[t]he Debarment was based . . . on other incidents, which were not mentioned in the Notice of Proposed Debarment . . . and which

51

Court has considered Plaintiffs' allegations of so-called "lingering effects" of the Debarment. Plaintiffs claim that they continue to lose business as a result of having to disclose the Debarment in government bids, despite the fact that it was vacated. However, Plaintiffs do not explain how a declaration that the Debarment was unlawful would solve any of these lingering effects. Plaintiffs do not claim for example, that such a declaration would *preclude* Defendants from requiring Plaintiffs to disclose their prior government contracting history and status, including previous debarments or suspensions. Nor is it clear to the Court how the Debarment's classification as "unlawful" would practically differ, insofar as clarifying or resolving the parties' legal interests, from the Debarment's current classification as vacated.[29] The requested judgment does not implicate the third and fourth factors enumerated by the Second Circuit — considering whether the requested judgment "is being used merely for 'procedural fencing' or a 'race to res judicata'" and whether the declaratory judgment would "increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court. *See Solvent Chem. Co.*, 664 F.3d at 26.

The fifth factor requires the Court to consider "whether there is a better or more effective remedy." *Id*. To the extent that Defendants institute another allegedly unlawful Debarment in the future, there is a better or more effective remedy available to Plaintiffs by presenting an administrative claim to the VA, and if necessary, by seeking agency review under the APA, as they seek to do here. As another district judge in this Circuit has remarked, "[w]hen the

Plaintiffs had not had an opportunity to address prior to the issuance of the Debarment . . . . [and] [a]s a result . . . [the] VA vacated the [D]ebarment." (Sec. Am. Compl. ¶ 82.)

[29] Moreover, as discussed *infra* Part II.e.i.2, Plaintiffs are not required to disclose the vacated Debarment in future government bids. Declaring the Debarment unlawful, thus, has no bearing on any such disclosure requirement.

traditional remedy provides the parties with the procedural safeguards required by the law to insure the availability of a proper remedy, the courts, in exercising their discretion, may properly dismiss the declaratory judgment." *U.S. Bank Nat. Ass'n ex rel. Lima Acquisition LP v. PHL Variable Ins. Co.*, No. 12-CV-6811, 2014 WL 998358, at * (S.D.N.Y. Mar. 14, 2014) (citing *John Wiley & Sons, Inc.*, 2011 WL 5245192, at *4).

Because three of the five factors weigh against the Court adjudicating Plaintiffs' request for a judgment declaring the Debarment unlawful, and the other two factors are not implicated, the Court declines to exercise its discretion and dismisses this claim. *See Dow Jones & Co.,* 346 F.3d at 360 (affirming district court's dismissal of declaratory judgment claim based, in part, on evaluation of the five prudential factors).

### 2. Declaration that Plaintiffs need not disclose Debarment in future government bids

The Second Amended Complaint also seeks a declaratory judgment finding that Plaintiffs do not have to disclose the Debarment in future bids for government contracts. (Sec. Am. Compl. ¶ 183.) On February 19, 2015, the Court ordered the parties to file a supplemental letter "clarifying if, and under what circumstances, Plaintiffs are required to disclose the fact of the vacated [D]ebarment, or any information about the [D]ebarment, in seeking potential government contracts from [D]efendants." (Order dated February 19, 2015.) The order required the parties to provide legal authority for any such requirement. (*Id.*) In their response to this order, Plaintiffs fail to address whether, and under what basis, they are required to disclose the vacated Debarment in bids for government contracts. (*See* Pls. Ltr dated Feb. 20, 2015, Docket Entry No 89.) Instead, Plaintiffs argue that pursuant to Federal Acquisition Regulation ("FAR") 52.209-5, codified at 48 C.F.R. § 52.209-5, they are required to disclose, not the Debarment, but the CVE Decision and the fact that Defendants "threat[ened]" to propose a debarment, in bid

proposals to government agencies. (*Id*. at 1–2.) Not only do these allegations fail to support

Plaintiffs' claim for declaratory relief as to the Debarment — they do not indicate that Plaintiffs

are required to disclose the vacated Debarment in bids for government contracts, but neither of

these allegations is the subject of Plaintiffs' declaratory judgment claim in the Second Amended

Complaint, nor are they referenced in the Second Amended Complaint. (*Id*. at 1–2; *see* Sec. Am.

Compl. ¶ 183 (requesting a declaratory judgment finding that "Plaintiffs need not disclose the

[D]ebarment while bidding on future federal government contracts").) Accordingly, the Court

will not issue a declaratory judgment finding that Plaintiffs do not need to disclose the

Debarment in bids for government contracts without any factual or legal basis demonstrating that

Plaintiffs are (or have been) required to make such a disclosure.[30] Under these circumstances,

consideration of the prudential factors weighs against considering this relief. A judgment from

the Court finding that Plaintiffs are not required to make this disclosure would not serve any

"useful purpose," or offer any relief from uncertainty. Moreover, in the event that Defendants do

require Plaintiffs to disclose the Debarment, and Plaintiffs are unlawfully prevented from an

award of a government contract because of the vacated Debarment, Plaintiffs can challenge that

---

[30]  Moreover, while it is clear that prospective contractors are required to disclose whether they are *currently* debarred, the Court is not aware of any provision, and Plaintiffs have not supplied any, that requires bidders to disclose past debarments, particularly when such debarments are vacated. *See* 48 C.F.R. § 52.209–5 (requiring offerors or their principals to certify whether they are "presently debarred, suspended, proposed debarment, or declared ineligible for the award of contracts by any Federal agency"); *see also Kirkpatrick v. White*, 351 F. Supp. 2d 1261, 1297 (N.D. Ala. 2004) (In response to argument from plaintiffs that their suspension from government contracting be voided *ab initio*, in part because the past suspension will have an impact on their ability to win future government contracts, defendants argued that plaintiffs did not have to disclose "any prior suspensions or debarments when competing for future contracts."). Defendants contend that under FAR 52.209-5, bidders are required to disclose only whether they are "presently debarred, suspended, proposed for debarment or declared ineligible for the award of contracts by any federal agency." (Defs. Ltr. dated Feb. 26, 2015, at 1, Docket Entry No. 90.)

decision pursuant to the administrative remedies addressing bid processes and offers. *See* 4

C.F.R. § 21, *et seq.* (providing bid protest regulations, including "[a]n interested party may

protest a solicitation or other request by a Federal agency for offers for a contract for the

procurement of property or services; the cancellation of such a solicitation or other request; and a

termination of such a contract"). Accordingly, the Court grants Defendants' motion to dismiss

Plaintiffs' declaratory claim which seeks a judgment finding that Plaintiffs are not required to

disclose the Debarment in future government bids.[31]

### 3. Declaration that Reconsideration Decision was unlawful

Although the Second Amended Complaint requests declaratory relief under the

Declaratory Judgment Act only as to the Debarment, it appears that in their opposition to

Defendants' motion to dismiss, Plaintiffs now seek a declaration that the Reconsideration

---

[31] Even if the prudential factors did not counsel otherwise, the Court could not consider this claim because it does not present an actual case or controversy. The Declaratory Judgment Act requires a justiciable controversy before a court can exercise its discretion in granting the relief. 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.") In assessing whether the "actual case or controversy" requirement is met, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 95 (2d Cir. 2011) (citation and internal quotation marks omitted). Here, as there is no factual or legal basis supporting Plaintiffs' claim that they are, or would be, required to disclose the Debarment in future government bids, there is no actual controversy. *See United States v. Juvenile Male*, 564 U.S. ----, ----, 131 S. Ct. 2860, 2864 (2011) ("Throughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."). In reaching this conclusion, the Court distinguishes between Plaintiffs' request for a declaration as to the lawfulness of the Debarment — a claim the Court found was not mooted by the vacature of the Debarment but which was not appropriate for declaratory relief, as discussed *supra* Part II.e.i.1 — and the request for a declaration finding that Plaintiffs' do not have to disclose the Debarment in future government bids — which alleged disclosure requirement is not factually or legally supported.

Decision was unlawful.  (Pl. Opp'n 51.)  Defendants argue that Plaintiffs' request for declaratory relief as to the Reconsideration Decision is precluded by the Court's August 9, 2013 ruling that the CVE Removal Decision was not arbitrary or capricious.  (Def. Mem 38.)  While the Court did deny Plaintiffs' request for a preliminary injunction, finding that the CVE Removal Decision was not arbitrary and capricious, the Court did not make a ruling on the Reconsideration Decision which post-dates the Court's order denying Plaintiffs' application for a preliminary injunction.  Defendants have not raised any other basis for dismissing Plaintiffs' declaratory relief request as to the Reconsideration Decision.  To the extent that Plaintiffs are requesting declaratory relief regarding the Reconsideration Decision, Plaintiffs must do so in an amended complaint alleging such a claim within thirty days of the date of this order.[32]

### ii.  Injunctive relief

Plaintiffs also request an injunction to prohibit Defendants from recommencing debarment proceedings.  Defendants argue that Plaintiffs do not have standing to seek this relief because they cannot show an injury that is "certainly impending."  (Def. Reply Mem. 71–72.) Defendants further contend that even if the Plaintiffs have standing to seek the requested injunctive relief, their request is unripe because if the VA chooses to commence another debarment proceeding, Plaintiffs will have the opportunity to challenge that proceeding administratively, before seeking review of the administrative process in federal court.  (*Id*. at 72.) Defendants also contend that Plaintiffs cannot show irreparable harm, an element necessary to

---

[32]  The Court notes that in contrast to the Debarment, which has been vacated and therefore is a "past act," the Reconsideration Decision is not a "past act" since Plaintiffs allege that they are still precluded from participation in the VIP Database.  Accordingly, the concerns outlined in Part II.e.i.1.B — namely, that a declaration regarding the unlawfulness of a vacated decision lacks a useful purpose and will not finalize the controversy and resolve uncertainty for the parties — does not apply to Plaintiffs' requested declaratory relief relating to the Reconsideration Decision.

obtain preliminary or permanent injunctive relief.  (*Id.*)  The Court finds that Plaintiffs do not have standing to seek the requested injunctive relief.

In order to show standing, a plaintiff must establish three things: (1) an "injury in fact —an invasion of a legally protected interest which is . . . concrete and particularized and actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3) redressability of the injury "by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *see Pincus v. Nat'l R.R. Passenger Corp.*, 581 F. App'x 88, 89 (2d. Cir. 2014) (describing three elements of standing) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("[I]n order to seek injunctive relief, a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)).  "[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm."  *Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d. Cir 2012); *see Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d. Cir. 1998) ("A plaintiff seeking injunctive relief or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.").  While past wrongs may be "evidence bearing on 'whether there is a real and immediate threat of repeated injury,' such evidence 'does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'"  *Pungitore*, 506 F. App'x at 42 (citing *Lyons*, 461 U.S. at 102).

Here, Plaintiffs assert that "Defendants' modus operandi of record is that they, repeatedly, and on widespread basis, violate veterans' constitutional rights during Debarments and CVE Removal Decisions" and that "in this very action, the Defendants have threatened

[that] they may 'recommence' unlawful debarment proceedings against the Plaintiffs." (Pl. Opp'n 52 (citing, *inter alia*, Sec. Am. Compl. ¶¶ 94 –98, 102, 105–118 and Sec. Am. Compl. Exs. 6, 14, 17).) Plaintiffs also allege continuing injuries as a result of the Debarment. (*E.g.*, Sec. Am. Compl. ¶¶ 75–76 (alleging that the Debarment "permanently destroy[ed] Plaintiffs' good names, reputations, honor, businesses, and prevent[ed] them from obtaining any meaningful employment).)

These allegations are insufficient to confer standing for Plaintiffs to seek a *carte blanche* prohibition against all future debarments or removals from the VIP database. While Plaintiffs may have sufficiently alleged a past injury, they have not shown sufficient likelihood of a future concrete injury. Instead, Plaintiffs base their request for injunctive relief on speculation that Defendants will indiscriminately target Plaintiffs for a debarment or for removal from the VIP database, that such debarment or removal will be "unlawful" for reasons that Plaintiffs have not and cannot specify, resulting in violations of Plaintiffs' "constitutional rights," none of which Plaintiffs have or can specify at this time. Plaintiffs cannot rely on such an "accumulation of inferences" to supply a predicate for prospective injunctive relief. *See Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (dismissing request for injunctive relief barring the use of strip searches for misdemeanor offenders because in order to meet the burden of showing a sufficient likelihood of a future unconstitutional strip search, plaintiff would have to show that "*if* he is arrested in Nassau County and *if* the arrest is for a misdemeanor and *if* he is not released on bail and *if* he is remanded to [a correctional facility] and *if* there is no particularized reasonable suspicion that he is concealing contraband he will again be strip searched"); *see also Lyons*, 461 U.S. at 105 ("That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and

perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."); *Williams v. City of New York*, --- F. Supp. 2d ----, 2014 WL 3639153, at *3–4 (S.D.N.Y. July 22, 2014) (rejecting request for "permanent injunction requiring the New York City Police Department to provide sign-language interpreters to hearing-impaired persons who are arrested or incarcerated" because plaintiff could not show likelihood that she would suffer future harm from the NYPD's failure to provide sign language assistance); *Williams v. N.Y. State Office of Mental Health*, No. 10-CV-1022, 2011 WL 4529651, at *3 (E.D.N.Y. Sept. 28, 2011) ("[S]ubjective fear of a potential violation of [plaintiff's] due process rights is too attenuated and speculative to make a showing of Article III standing or to satisfy the standard required for an injunction.").

Nor does the fact that Defendants may have expressed their intent to debar Plaintiffs in the future confer standing for Plaintiffs to seek their requested relief, absent any allegations demonstrating the likelihood that a future debarment would be unlawful, and thus injurious to Plaintiffs. *See Lyons*, 461 U.S. at 108 (accepting that "there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted" but characterizing as "no more than conjecture" the possibility that the police will act "unconstitutionally and inflict injury" in every instance of a citizen and police encounter or in any future interaction with *plaintiff* to merit injunctive relief). Thus, Plaintiffs' request for injunctive relief to prevent future debarments is denied.

### iii.    Review of agency action

In addition to declaratory and injunctive relief, the Second Amended Complaint's "Fourth Claim for Relief" seeks a "review of agency action." (Sec. Am. Compl. ¶ 65.) While the Second Amended Complaint requests that the Court "reverse the CVE Removal Decision in its entirety," (*id*. ¶ 180), Plaintiffs clarify in their opposition to Defendants' motion to dismiss that they are seeking a review and vacatur of the Reconsideration Decision, (Pl. Opp'n 51). Defendants argue that the Second Amended Complaint does not seek review of the Reconsideration Decision. (Def. Reply Mem. 73–74.) Defendants do not object to an amendment of the Second Amended Complaint to include such a claim. (*Id*.) Defendants also expressly reserve "any and all defenses and arguments in response to such a claim." (*Id*. at 74 n.33.)

The Court agrees that in the Second Amended Complaint, Plaintiffs' allegation that they are seeking "review of agency action" does not clearly allege that Plaintiffs are seeking a review of the Reconsideration Decision, and not the initial CVE Removal Decision. Thus, to the extent Plaintiffs intend to pursue this claim, they are permitted to amend the Second Amended Complaint to do so.

### III. Conclusion

For the reasons set forth above, the Court grants Defendants' motion to dismiss the Second Amended Complaint. In accordance with this order, Plaintiffs are permitted to file an Amended Complaint within thirty days of this order. Plaintiffs may amend their RICO claim to the extent that they can, as well as their claims under the Declaratory Judgment Act and the APA as to the Reconsideration Decision.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 16, 2015
       Brooklyn, New York