UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

DERRICK STORMS, A1 PROCUREMENT, LLC,
A1 PROCUREMENT JVH, A1 PROCUREMENT
– TRANSPORTATION LEASING CORP., LLC,
A1 PROCUREMENT, JVG,

**MEMORANDUM & ORDER**
13-CV-811 (MKB)

                                    Plaintiffs,

                    v.

UNITED STATES OF AMERICA and the
DEPARTMENT OF VETERANS AFFAIRS,

                                    Defendants.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On December 20, 2015, Plaintiffs Derrick Storms, A1 Procurement, LLC ("A1"), A1

Procurement JVH, A1 Procurement – Transportation Leasing Corp., LLC and A1 Procurement,

JVG filed a Third Amended Complaint ("TAC") in the above-captioned action against

Defendants the United States of America and the Department of Veterans Affairs (the "VA").[1]

(TAC, Docket Entry No. 112.) Plaintiffs allege that Defendants arbitrarily denied

reconsideration of Plaintiffs' application to renew A1's status as a "qualified Service-Disabled,

Veteran-Owned Small Business" ("SDVOSB"), in violation of the Administrative Procedures

Act, 5 U.S.C. § 701 *et seq.* (the "APA") and Plaintiffs' due process rights under the Fifth

Amendment of the U.S. Constitution. (*Id.* ¶ 1.)

Defendants move to dismiss the Third Amended Complaint pursuant to Rules 12(b)(1)

and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that all Plaintiffs, except for A1,

---

[1] Plaintiffs' First Amended Complaint and Second Amended Complaint named several
individual defendants who are not named in the Third Amended Complaint.

lack standing to pursue their claims and that the TAC is moot and meritless. (Defs. Mot. to Dismiss, Docket Entry No. 126; Center for Verification and Evaluation Admin. Record ("R."), Docket Entry No. 128; Defs. Mem. in Supp. of Defs. Mot. to Dismiss ("Defs. Mem."), Docket Entry No. 129.) For the reasons discussed below, the Court grants Defendants' motion.

## I. Background

Plaintiffs allege that Defendants unlawfully revoked A1's ability to obtain set-aside government contracts through the VA's SDVOSB program. The Court assumes the parties' familiarity with the underlying facts, which are described in greater detail in *Storms v. United States*, No. 13-CV-811, 2015 WL 1196592, at *1–4 (E.D.N.Y. Mar. 16, 2015), and repeats only the facts relevant to decide this motion.

### a. Statutory and regulatory framework

Congress enacted the Veterans Benefits, Health Care, and Information Technology Act of 2006 (the "Veterans Benefits Act") to increase contracting opportunities for small businesses owned by service-disabled veterans. *See* 38 U.S.C. §§ 8127–8128. Congress conferred upon the VA the authority to set aside certain government contracts for SDVOSBs and to maintain a database of small businesses eligible for the set-aside contracts. *Id.* § 8127(f). As a result, the VA maintains an online database of eligible small businesses called the VetBiz Vendor Information Pages ("VIP"). 38 C.F.R. § 74.1. By statute, "[a] small business concern may be awarded a contract [set aside for SDVOSBs] only if the small business concern and the veteran owner of the business are listed in the database of veteran-owned businesses maintained by the Secretary [of the VA]." 38 U.S.C. § 8127(e).

To be listed as an SDVOSB in the VIP, a business must file an application with the VA's

Center for Verification and Evaluation ("CVE"),[2] which is charged with evaluating applications

to determine whether a small business is "unconditionally owned and controlled by one or more

eligible veterans, service-disabled veterans or surviving spouses."[3]  38 C.F.R. §§ 74.1, 74.11,

74.2(a).  According to VA regulations, "control means both the day-to-day management and

long-term decision-making authority for the [business]."  *Id.* § 74.4(a).  The VA elaborates that

"[a]n applicant or participant's management and daily business operations must be conducted by

one or more veterans or service-disabled veterans," and that "[i]ndividuals managing the

[business] must have managerial experience of the extent and complexity needed to run the

[business]."  *Id.* § 74.4(b).  Among other requirements, "[o]ne or more veterans or service-

disabled veteran owners . . . must devote full-time to the business during the normal working

hours of firms in the same or similar line of business."  *Id.* § 74.4(c)(3).  Separately, the VA

notes that:

> "[o]wners need not work full-time but must show sustained and
> significant time invested in the business.  An owner engaged in
> employment or management outside the applicant [business] must
> submit a written statement supplemental to the application which
> demonstrates that such activities will not have a significant impact
> on the owner's ability to manage and control the [business]."

*Id.* § 74.4(c)(1).

---

[2]  On September 30, 2013, the Center for Veterans Enterprise changed its name to the Center for Verification and Evaluation.  *See* Center for Veterans Enterprise (CVE) Name Change Press Release, Oct. 10, 2013, *available at* https://www.va.gov/osdbu/pressreleases/news20131010.asp (last accessed Apr. 24, 2017).

[3]  The parties do not dispute that a service-disabled veteran "owned" A1, but rather dispute whether a service-disabled veteran "controlled" A1.  The Court therefore focuses on the provisions pursuant to which the VA determines who controls an SDVOSB.

If the CVE determines that a business should be verified as an SDVOSB, the business will be listed in the VIP for two years. *See id.* §§ 74.11(f), 74.15 (2012). A business whose application is denied may request reconsideration of the denial. *Id.* § 74.13(a).

### b. Factual background

A1 is a limited-liability company founded by Plaintiff Storms in 2009. (Seconded Amended Complaint ("SAC") ¶ 11, Docket Entry No. 47.) Plaintiffs A1 Procurement JVH ("A1 JVH"), A1 Procurement – Transportation Leasing Corp., LLC ("A1 Transportation"), and A1 Procurement, JVG ("A1 JVG") are joint ventures of A1. (TAC ¶ 8.)

In September of 2009, A1 filed an application with the CVE to be listed in the VIP. (R. 1.) The parties do not dispute that at the time of A1's application to the CVE, Storms had a fifty-one percent ownership interest in A1 and Adrian Batlle[4] had a forty-nine percent interest in A1. (*See id.* ¶ 11; Defs. Mem. 3–4.) Storms is a service-disabled veteran, but Batlle is not. (TAC ¶ 7; Defs. Mem. 4.) The CVE conducted a review of A1's application and, on April 7, 2010, approved A1 for listing in the VIP. (R. 3–77.) CVE's approval of A1 indicated that A1 was "both owned and controlled by Mr. Storms," as required by the VA's regulations. (TAC ¶ 11.)

On February 16, 2011, A1 filed an application to renew its SDVOSB status and inclusion in the VIP for the upcoming two years. (R. 153.) The CVE reviewed A1's tax returns, (R. 268–325); Articles of Organization, (R. 263–64); the Operating Agreement between Storms and

---

[4] The Complaint, the Amended Complaint, (Am. Compl., Docket Entry No. 18), and the Second Amended Complaint, (SAC), were filed by the same Plaintiffs who filed the Third Amended Complaint but also included former plaintiff Adrian Batlle, then a part-owner in the A1 enterprises. Batlle is not named in the caption of the Third Amended Complaint, and the Court understands this to mean that he is no longer a plaintiff in this action.

Batlle, (R. 265); business registration documents filed with Florida state agencies, (R. 187–88, 266–67); a lease agreement, (R. 326–28); payroll records, (R. 329); contracts, (R. 330–36); licenses, (R. 339–41); VIP profile, (R. 277–78); Storms' disability determination, (R. 342–43); Storms' resume, (R. 337–38); and publicly available documents from the internet, (R. 179–261). The CVE also reviewed Storms' statement that he "works [forty] hours per week for A1" as its Chief Executive Officer ("CEO") and that his duties include "directing company operations, management oversight, directing marketing strategy, obtaining financing [and] creating the company culture." (R. 262; Defs. Mem. 5.) Storms' statement noted that Batlle was the president of A1 and "manage[d] . . . day to day operations, contract bidding, contract management, book keeping and payroll." (R. 262.) Storms' resume reflects that at the time, Storms was also serving as the managing partner of his law firm, Storms & Associates, P.C. ("Storms & Associates"), and as the president of Homeless Veterans of America, Inc. ("HVAI"). (R. 337–38.)

### i. CVE removal decision

By decision dated August 9, 2011, the CVE denied A1's renewal application, citing Storms' failure to demonstrate that he satisfied the "control" requirements of 38 C.F.R. § 74.4 (the "CVE Removal Decision"). (R. 360–63.) The CVE noted that a service-disabled veteran must "devote full-time to the business during the normal working hours of firms in the same or similar line of business," and that "[e]ngagement in employment or management outside the applicant concern must not 'have a significant impact on the owner's ability to manage and control the applicant concern.'" (R. 360–61 (quoting 38 C.F.R. § 74.4(c)(1)).) The CVE explained that because Storms' resume stated that he was currently the president of HVAI and the managing partner of Storms & Associates, and because Storms had failed to submit the

required supplemental statement demonstrating that his outside activities would not significantly impact his ability to manage and control A1, the CVE could not conclude that Storms was devoting his full time to A1. (R. 361.) The CVE informed A1 that A1 could request reconsideration of the decision or file a new application for SDVOSB status, and "[t]he Director . . . will issue a written decision within [sixty] days, when practicable, of receipt of the applicant's request." (R. 362–63 (quoting 38 C.F.R. § 74.13(b)).)

Plaintiffs allege that the CVE Removal Decision was the result of "[a] personal feud" between Storms and a CVE employee, David Eckenrode. (TAC ¶¶ 12, 13.) On April 25, 2011, Storms criticized Eckenrode, and shortly thereafter, Eckenrode was appointed Deputy Director of the CVE. (*Id.* ¶ 14.) Plaintiffs allege that Eckenrode "abused his newly appointed position" by "unjustifiably removing A1 from the VIP database without good cause." (*Id.* ¶ 15.)

### ii.  Reconsideration Decision

On August 23, 2011, A1 submitted a request for reconsideration of the CVE Removal Decision. (R. 505–663.) The CVE received the request for reconsideration on September 20, 2011,[5] and informed A1 that "[a]lthough CVE has [sixty] days to complete requests for reconsideration, we seek to complete the action as soon as possible"; accordingly, A1 could "expect to receive a decision no later than November 21, 2011."[6] (R. 502, 504.) As part of its request for reconsideration, A1 included a statement from Storms explaining that he worked full-

---

[5] The CVE "initially represented that it had not received A1's request for reconsideration" but, "[a]fter being contacted by Senator [Marco] Rubio's office, on September 21, 2011, the CVE changed its position and stated that it had timely received A1's request for reconsideration." (TAC ¶¶ 22–23.)

[6] Elsewhere, the CVE appears to have told A1 that it received the request for reconsideration on August 29, 2011, and would issue its reconsideration decision no later than October 28, 2011. (*See* Email from Amanda Abbey dated Sept. 21, 2011, annexed to TAC as Ex. 5.)

time at A1 from 7:00 AM to 6:00 PM, five-to-six days per week, worked at HVAI three-to-four hours per month by volunteering at a soup kitchen, and worked at Storms & Associates four-to-five hours per month, primarily servicing A1's legal needs. (R. 507.) Storms explained that he worked full-time as A1's CEO and that his other obligations were minimal and did not prevent him from controlling A1. (R. 507.) Storms also attached emails he had sent during normal working hours to contractors and subcontractors on behalf of A1 and noted that A1's official bylaws indicated that as CEO, he controlled long-term decision-making and day-to-day management, and that his signature was required for all official company documents. (R. 509.)

The CVE did not decide A1's request for reconsideration within sixty days. While A1's request for reconsideration was pending, it was not permitted to bid on set-aside contracts with the VA. (*See* TAC ¶ 25; R. 498.) According to Plaintiffs, after A1 contacted Senator Rubio's office to complain about the CVE's delay in reconsidering A1's application, the VA "unlawfully" issued proposed debarment notices to Storms, Batlle and A1 advising them that the VA was initiating debarment proceedings against them for "allegedly misrepresenting A1's SDVOSB status" while submitting a bid for a government contract in November of 2011. (SAC ¶ 69.) The VA debarred A1 from May 2, 2012 until February 19, 2013, at which point the VA vacated A1's debarment. (*See* Defs. Mem. 8 n.5; SAC ¶¶ 69–89.)

On August 9, 2013, the Court issued an order directing the CVE to issue a decision on A1's request for reconsideration no later than August 31, 2013. (*See* Order dated Aug. 9, 2013.) In a decision dated August 30, 2013 (the "Reconsideration Decision"), the CVE denied A1's request for reconsideration. (R. 684–95.) The CVE made three findings in the Reconsideration Decision, one of which addressed A1's failure to cure the initial defect that prompted the CVE Removal Decision and two of which raised additional concerns not previously addressed in the

CVE Removal Decision.  First, the CVE found that A1 had not "sufficiently corrected" the issue of control and management that prompted the CVE Removal Decision.  (R. 684.)  The CVE found that although Storms' work for HVAI did not preclude him from working full-time for A1, Storms' law firm work did preclude him from working full-time for A1.  (R. 687.)  Since "a law firm generally operates in the normal business hours of 9 am to 5 pm," the CVE concluded that Storms worked at his law firm "within the same hours as he would have to work at A1 in order to devote full time to A1."  (R. 687.)  The CVE also held that it was not relevant, for purposes of 38 C.F.R. § 74.4(c)(3), that most of Storms & Associates' work catered to A1, since that work was performed by the law firm and not by A1.[7]  (R. 687.)  Finally, the CVE found that "what is not represented is the overall amount of time or hours required to perform all the services associated with the legal services provided to [A1] in conjunction with the [service-disabled veteran's ("SDV")] other managerial responsibilities concerning the wide range of contract actions for this applicant."  (R. 687.)

Second, the CVE found that Storms did not control A1 consistent with the provisions of 38 C.F.R. § 74.4(b) that require an SDV to possess the managerial skills necessary to run his or her business.  (R. 688.)  Having reviewed the contracts awarded to A1, the CVE noted that A1 had "[thirty-one] separately active Joint Ventures" and performed projects from ventilation and duct cleaning to mold remediation to paratransit bus leasing.  (R. 688.)  The CVE found that "none of [the] experience" listed in Storms' resume "reasonably supports the ability to manage such a wide disparity of enterprises and services."  (R. 692.)  The CVE also found among A1's

---

[7]  Storms had submitted a statement representing that he worked "a maximum of [four] to [five] hours per month primarily performing direct legal services for A1," and provided "examples of legal services [Storms & Associates] provided A1 in the past year."  (R. 508.)  In addition, Storms represented that in the prior fifteen months, he had "only performed legal services on five (5) occasions that do not involve direct support services for A1."  (R. 508.)

contracts and proposals submitted to the VA "a pattern" of "having only two employees and yet claiming the ability to provide a myriad of services in varying industries <u>nationwide</u> for which [A1] clearly solicits [non-SDVOSB] entities to perform 100 percent of the work with A1 receiving a minor 5–10% markup." (R. 691 (emphasis in original).) The CVE provided examples of A1's arrangement with non-SDVOSB subcontractors who lent the technical and managerial expertise to perform each set-aside contract and described A1 as "a classic case in which a concern misuses the [SDVOSB] status in order to allow non-[SDVOSB] firms to take part" and thereby "take improper advantage of the SDVOSB set-aside program." (R. 691.)

Finally, the CVE found that A1 had made false statements to the VA in violation of 38 C.F.R. § 74.2(c). (R. 542.) The CVE noted that after A1's SDVOSB status expired and it was subsequently removed from the VIP, A1 nevertheless submitted bids to the VA that included an SDVOSB logo next to A1's logo and represented that A1 had SDVOSB status. (R. 692–94.) Consequently, the CVE concluded, A1 did not meet the eligibility requirements associated with good character under 38 C.F.R. § 74.2. (R. 694.) The CVE informed A1 that it was "immediately eligible to submit a new application" to be included in the VIP and that the CVE would "process the new application as it would an initial application." (R. 695.) In reapplying, A1 was required to "establish through adequate evidentiary support that it has overcome the reasons for both the initial and final denial letters." (R. 695.) A1 did not reapply.

### c. Procedural background

Plaintiffs filed the Complaint and a motion for a preliminary injunction on February 13, 2013. (Compl., Docket Entry No. 1; Mot. for Prelim. Inj., Docket Entry No. 4.) On August 9,

2013,[8] the Court held a hearing on the motion for a preliminary injunction and on Defendants' anticipated motion to dismiss the Complaint. (*See* Min. Entry dated Aug. 9, 2013.) The Court denied Plaintiffs' motion for a preliminary injunction, ordered Defendants to rule on A1's pending request for reconsideration of the denial of its SDVOSB status by August 31, 2013, and set a briefing schedule for the motion to dismiss. (*Id.*) Defendants denied A1's reconsideration request on August 30, 2013. (R. 684–95.)

On October 11, 2013, Plaintiffs filed the SAC, bringing claims pursuant to *Bivens*,[9] the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Federal Tort Claims Act ("FTCA"), the Declaratory Judgment Act and the APA. (SAC.) On February 28, 2014, Defendants filed a motion to dismiss the SAC, and on September 23, 2014, the Court heard oral argument on the motion. (*See* Minute Entry dated Sept. 23, 2014.) At oral argument, the Court granted Defendants' motion to dismiss Plaintiffs' RICO claim for failure to allege two racketeering acts. (*See id.*) In a decision dated March 16, 2015 (the "March 2015 Decision"), the Court granted Defendants' motion to dismiss the SAC and permitted Plaintiffs to amend the SAC as to their RICO claim and their claims under the Declaratory Judgment Act and the APA. *See Storms*, 2015 WL 1196592, at *1. On November 20, 2015, the Court denied reconsideration of the March 2015 Decision. (Mem. & Order dated Nov. 20, 2015, Docket Entry No. 111.) Plaintiffs filed the TAC on December 20, 2015.

_____

[8] Between February and August of 2013, the parties briefed the motion for a preliminary injunction, Defendants filed a motion for a protective order, Plaintiffs amended the Complaint, and Defendants requested a pre-motion conference in anticipation of filing a motion to dismiss the Amended Complaint. (*See* Docket Entry Nos. 5–32.)

[9] In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court created a cause of action for violations of the Constitution by persons acting under the color of federal law.

The TAC alleges that Defendants' Reconsideration Decision "improperly and unlawfully den[ied A1's] application for inclusion in the [VIP] database" in violation of the APA. (TAC ¶ 1.) Plaintiffs request that the Court "overturn and vacate the VA's unnoticed and improper Reconsideration Decision because the decision is contrary to the VA's mandatory policies and procedures" and because "the decision violates [] Plaintiffs' procedural and substantive Fifth Amendment rights." (*Id.* ¶ 40.) Plaintiffs also seek a declaration, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, that Defendants "acted improperly and unlawfully in delaying the VA's Reconsideration Decision, that the Reconsideration Decision is improper and unlawful, and that A1 is an SDVOSB concern." (*Id.* ¶ 44.)

Defendants move to dismiss the TAC. Defendants argue that (1) Plaintiffs' claims are moot, (Defs. Mem. 12); (2) all Plaintiffs except A1 lack standing to challenge the Reconsideration Decision, (*id.* at 16); and (3) Plaintiffs fail to state a claim for relief because the CVE did not violate Plaintiffs' due process rights and the Reconsideration Decision was not arbitrary or capricious, (*id.* at 17–25).

## II. Discussion

### a. Standards of review

#### i. Motion to dismiss for lack of jurisdiction

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure when the court "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)); *see also Chau v. S.E.C.*, 665

F. App'x 67, 70 (2d Cir. 2016). The plaintiff has the burden to prove that subject matter jurisdiction exists, and in evaluating whether the plaintiff has met that burden, "'[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citations omitted), *aff'd*, 561 U.S. 247 (2010). A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists. *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010).

### ii.  Motion to dismiss for failure to state a claim

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Concord Assoc's, L.P. v. Entm't Prop. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this

principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

### iii. Rule 12(b)(6) – documents considered

"In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Wilson v. Kellogg Co.*, 628 F. App'x 59, 60 (2d Cir. 2016) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)). In addition, courts may consider "documents that, although not incorporated by reference, are integral to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). A court need not consider other information outside the pleadings, but where a court does not exclude extraneous information, it must give notice to the parties and convert the motion to one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(d); *see also Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68 (2d Cir. 2014) (noting that before converting a motion to dismiss into a motion for summary judgment, the court should "give sufficient notice to an opposing party and an opportunity for that party to respond"); *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202–03 (2d Cir. 2013) ("[T]he conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is strictly enforce[d] and mandatory.").

### iv. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)).

"'When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal' and 'the entire case on review is a question of law.'" *Brezler v. Mills*, --- F. Supp. 3d. ---, ---, 2016 WL 7100597, at *13 (E.D.N.Y. Dec. 6, 2016) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083–84 (D.C. Cir. 2001)); *see also Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 334 (S.D.N.Y. 2015) (quoting same). Thus, a summary judgment determination is "generally appropriate" in APA cases because "the question [of] whether an agency's decision is arbitrary and capricious . . . is a legal issue amenable to summary disposition." *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985)); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). However:

> extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice.

*Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).  A court may also remand a case to the agency for additional fact-finding when there is insufficient evidence to support the decision.  *Id.*

### b.  The Court converts Defendants' Rule 12(b)(6) motion to a Rule 56 motion

Defendants bring their motion pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  The parties include extra-record materials relevant to the portions of Defendants' 12(b)(6) motion involving due process.  (*See, e.g.*, Letter from U.S. House of Reps., annexed to Pls. Opp'n Mem. as Ex. 3; VIP Reconsideration Procedures, annexed to Pls. Opp'n Mem. as Ex. 7; Decl. of Thomas J. McGrath, Docket Entry No. 127; Court Filings, annexed as Exs. 1–4 to Decl. of Elliott M. Schachner, Docket Entry No. 127.)  The Court gave the parties notice of its intent to convert Defendants' motion to dismiss to a summary judgment motion and permitted the parties to file supplemental briefs addressing the possible conversion of the motion. (*See* Order dated Apr. 26, 2017.)  Plaintiffs timely objected to conversion, arguing that by converting the motion, the Court would be crediting Defendants' "post-hoc rationalizations" instead of confining itself to the administrative record.  (*See* Pls. Objs. to Conversion, Docket Entry No. 136.)

In converting a motion to dismiss, "[t]he essential inquiry is whether the [nonmoving party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."  *Sahu v. Union Carbide Corp.*, 548 F.3d 59 (2d Cir. 2008) (quoting *In re G&A Books, Inc.*, 770 F.2d 288, 295 (2d Cir. 1985), *cert. denied*, 475 U.S. 1015 (1986)); *see also Parado v. Banco Industrial De Venezuela, C.A.*, 753 F.3d 62 (2d Cir. 2014)

("[A] district court acts properly in converting a motion . . . into a motion for summary judgment when the motion presents matters outside the pleadings" and the court gives "sufficient notice to an opposing party and an opportunity for that party to respond" (internal quotation marks omitted) (quoting *Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009))); *Galiotti v. Green*, 475 F. App'x 403, 404 (2d Cir. 2012) (quoting same); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995) (noting that the party opposing the motion must be given "sufficient notice" and an opportunity to respond).  A party cannot complain of a lack of reasonable opportunity to present all material relevant to a motion for summary judgment "when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss."  *Id*.; *see also Hernandez*, 582 F.3d at 307 (noting that formal notice is not required where a party "should reasonably have recognized the possibility that the motion might be converted into one for summary judgment [and] was [neither] taken by surprise [nor] deprived of a reasonable opportunity to meet facts outside the pleadings" (alterations in original) (quoting *Villante v. Dep't of Corr.*, 786 F.2d 516, 521 (2d Cir. 1986))).

Plaintiffs have requested consideration of numerous extra-record declarations and documents and have provided no meaningful objection to the Court's conversion of the motion. In addition, the Court "'sits as an appellate tribunal' and 'the entire [APA claim] on review is a question of law.'"  *Brezler*, --- F. Supp. 3d. at ---, 2016 WL 7100597, at *13.  Accordingly, the Court converts Defendants' motion to dismiss Plaintiffs' non-APA claims under Rule 12(b)(6) into a motion for summary judgment under Rule 56.  As to Plaintiffs' APA claim, the Court constrains its review to the administrative record.  *See Nat'l Audubon Soc'y*, 132 F.3d at 14 ("Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." (citing *Fla. Power & Light*, 470 U.S. at

743–44)); *see also Fla. Power & Light*, 470 U.S. at 743–44 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

### c. Mootness

Defendants argue that Plaintiffs' claims are moot because, "[h]ad the Reconsideration Decision approved the renewal application, A1 would have been granted SDVOSB status for only a period of two years commencing on the date of that decision – i.e., until August 30, 2015." (Defs. Mem. 12 (citing 38 CFR § 74.15(a) (a business approved for inclusion on the Database "receives an eligibility term of [two] years from the date of" approval)).) Thus, Defendants argue, even if the Court were to conclude that the Reconsideration Decision was wrongly decided, A1 could not be restored to SDVOSB status because its two-year status would have expired in August of 2015, nearly two years ago. (*Id*. at 11–12.) Plaintiffs argue that the Court may still require Defendants to restore A1 to SDVOSB status, notwithstanding the expiration of a prior term in the VIP, and that such restoration of A1 would remedy Plaintiffs' injuries. (Pls. Opp'n Mem. 5.)

"If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 577 U.S. ---, ---, 136 S. Ct. 663, 669 (Jan. 20, 2016) (internal quotation marks omitted) (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. ---, ---, 133 S. Ct. 1523, 1528 (Apr. 16, 2013)). "A case becomes moot, however, 'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Id.* (quoting *Knox v. Service Emps.*, 567 U.S. 298, 307 (2012)). "As long as the parties have a

concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (quoting *Chafin v. Chafin*, 568 U.S. 165, 133 S. Ct. 1017, 1023 (2013)).

The Second Circuit applies a two-part test to determine mootness. An issue is moot "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 54 (2d Cir. 2008) (citing *Granite State Outdoor Adver., Inc. v. Town of Orange, Conn.*, 303 F.3d 450, 451 (2d Cir. 2002) (per curiam)). When a defendant claims that its voluntary cessation or compliance moots a case, the defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

Defendants have failed to make either showing under the two-part test. First, Defendants have not shown that "there is no reasonable expectation that the alleged violation will recur." *Catazano*, 277 F.3d at 107. Second, Defendants have not shown that any interim events have eradicated the effects of the Reconsideration Decision. In fact, Plaintiffs assert that A1 "stopped bidding on federal contracts solely because of the Defendants' [sic] removing A1 from the [VIP] database" and "will resume bidding on the VA contracts as soon as this Court vacates the VA's unlawful decision." (Decl. of Derrick Storms ¶¶ 4, 5, annexed to Pls. Objs. to Conversion.)

In support of their mootness argument, Defendants cite *Mohamed v. Gonzales*, 436 F.3d 79 (2d Cir. 2006), in which the plaintiffs were selected for diversity immigrant visas, but, due to "sheer bureaucratic ineptitude or intransigence," the former Immigration and Naturalization Service ("INS") did not issue the visas to the plaintiffs. *Mohamed*, 436 F.3d at 81. The plaintiffs

sued to compel INS to issue the visas, and the Second Circuit held that the action was moot because INS lacked the statutory authority to grant the relief the plaintiffs sought. *Id.* Under the statutory authority granted to INS, the agency could issue diversity visas to immigrants "*only* through the end of the specific fiscal year for which they were selected," *id.*; thus, even if the court found the plaintiffs' case meritorious, it could not require the agency to act outside of its authority. *Mohamed* is inapposite because, unlike the INS regulations at issue in that case, the VA is not precluded from renewing A1's SDVOSB status. Indeed, the VA has previously been ordered to do precisely that. *See KMV, Inc. v. United States*, 111 Fed. Cl. 119, 128 n.7 (2013) (ordering the VA to reinstate the plaintiff's veteran-owned small business ("VOSB") statute extending the eligibility date "to account for the days it was wrongfully excluded from the VIP database").

Because Defendants have not demonstrated that "interim relief or events have completely and irrevocably eradicated the effects of" the debarment, this issue is not moot. *See Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 110 (2d Cir. 2010) ("The voluntary cessation of allegedly illegal activity may render a case moot 'if . . . there is no reasonable expectation that the alleged violation will recur and . . . interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" (citing *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996))); *Babcock v. Frank*, 729 F. Supp. 279, 287 (S.D.N.Y. 1990) (noting that plaintiff may be entitled to declaratory judgment in harassment case even though chief perpetrator of sexual harassment was demoted and transferred and thus, "there [was] no reasonable expectation" that the violation would recur, in light of the fact that it could not "be said that interim relief or events" had eradicated the effects of her harassment).

### d. Standing

Defendants argue that all Plaintiffs other than A1 lack standing to challenge the Reconsideration Decision because that decision denied SDVOSB status to only A1, and not to its affiliated entities. (Defs. Mem. 16.) Plaintiffs argue that standing is assessed from the moment a suit is filed, not periodically reassessed based on the outcome of dispositive motions, and that Plaintiffs all had the requisite stake in the outcome of the case when it was filed. (Pls. Opp'n Mem. 6.)

In order to show standing, a plaintiff must establish three things: (1) an "injury in fact —an invasion of a legally protected interest which is . . . concrete and particularized and actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complained of," and (3) redressability of the injury "by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *see Pincus v. Nat'l R.R. Passenger Corp.*, 581 F. App'x 88, 89 (2d Cir. 2014) (describing three elements of standing) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("[I]n order to seek injunctive relief, a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability." (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009))).

"It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *Steinberger v. Lefkowitz*, 634 F. App'x 10, 11 (2d Cir. 2015) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). The plaintiff thus bears the burden "clearly to allege facts [in his complaint] demonstrating that he is the proper party to invoke judicial resolution of the dispute." *Id.* (alterations in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see also Raines v.*

*Byrd*, 521 U.S. 811, 818 (1997) (noting that the standing inquiry "focuses on whether the plaintiff is the proper party to bring suit"). "If the plaintiff fails to make the necessary allegations, he has no standing." *Steinberger*, 634 F. App'x at 11 (quoting *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 273 (2d Cir. 1994)).

The parties do not dispute that A1 has standing to challenge the Reconsideration Decision; rather, they dispute whether Storms, A1 JVH, A1 Transportation and A1 JVG have standing to challenge the Reconsideration Decision. In the TAC, Plaintiffs allege that A1 JVH, A1 Transportation and A1 JVG are "joint ventures of A1 Procurement, LLC," (TAC ¶ 8), but provide no further information about the relationship between Plaintiffs. Nor does the TAC specify any injury to Plaintiffs other than A1 or suggest that other Plaintiffs were previously considered SDVOSBs and subsequently removed from the VIP. In fact, Plaintiffs assert only that "all Plaintiffs had standing when this action was commenced, and they continue to have standing," without specifying why Plaintiffs are presumed to have had standing when the action was commenced.[10] (Pls. Opp'n Mem. 6.) Without any such allegations, the Court cannot conclude that Storms, A1 Transportation, A1 JVH and A1 JVG suffered an injury in fact attributable to Defendants, or that a favorable decision from this Court could redress their injury.

---

[10] To the extent that Plaintiffs are arguing that they had standing to bring the claims alleged in the Complaint, First Amended Complaint and SAC, those claims have either been dismissed without leave to replead — as in the case of Plaintiffs' *Bivens* claims based on A1's debarment or the CVE Removal Decision — or were dismissed with leave to replead but were not raised in the TAC, as in the case of Plaintiffs' RICO claim. Even as to these claims, non-A1 Plaintiffs have not alleged facts demonstrating that they are the proper parties to invoke judicial resolution of the dispute; it is not clear, as Plaintiffs assert in their opposition brief, that "all Plaintiffs had standing when this action was commenced." (Pls. Opp'n Mem. 6); *see Steinberger v. Lefkowitz*, 634 F. App'x 10, 11 (2d Cir. 2015).

*See Lujan*, 504 U.S. at 560–61.  The Court therefore dismisses all Plaintiffs except A1 Procurement, LLC from the case.

### e.  APA claim

Defendants argue that the Reconsideration Decision correctly determined that Storms lacked "control" over A1 according to the VA's definition of "control," which itself is reasonable and deserves the Court's deference.  (Defs. Mem. 21.)  Plaintiffs argue that the Reconsideration Decision was arbitrary and capricious because it "was not based on the relevant evidence before the agency"[11] and because it was based on additional, subjective factors that extend beyond Congress' delegation of authority to the VA.  (Pls. Opp'n Mem. 7.)  In particular, Plaintiffs argue that A1 properly demonstrated that Storms controlled, managed and worked full-time at A1 in compliance with the VA's control regulations, and the VA nevertheless "arbitrarily and capriciously disregarded A1's statements."[12]  (*Id.* at 11.)

---

[11]  Plaintiffs argue in their opposition brief that the CVE Removal Decision was also arbitrary and capricious, although the TAC requests relief only as to the Reconsideration Decision.  (*See* TAC ¶¶ 44–45; Pls. Opp'n Mem. 7–10.)  As the Court explained in the March 2015 Decision, the Court already found that the CVE Removal Decision was not arbitrary and capricious in the August 9, 2013 preliminary injunction ruling.  *See Storms*, 2015 WL 1196592, at *26 ("While the Court did deny Plaintiffs' request for a preliminary injunction, finding that the CVE Removal Decision was not arbitrary and capricious, the Court did not make a ruling on the Reconsideration Decision which post-dates the Court's order . . . .").  The Court therefore will not address Plaintiffs' unpled arguments regarding the CVE Removal Decision.

[12]  In their opposition brief, Plaintiffs raise for the first time an argument that the VA's regulations regarding ownership and control are *ultra vires* and should be held unlawful.  (Pls. Opp'n Mem. 20–21.)  Plaintiffs did not plead a claim under 5 U.S.C. § 706(2)(C), which allows a court to set aside an agency action that is "in excess of statutory [] authority," and the Court therefore declines to consider the argument that the VA's regulations are *ultra vires*, except to the extent that the argument overlaps with Section II(e)(ii), *infra*, discussing the VA's interpretation of its role in verifying that SDVOSBS are "owned and controlled by veterans."

### i.    Judicial review of an administrative decision

A court's review in an APA case is limited to the administrative record.  5 U.S.C. § 706;

*Camp v. Pitts*, 411 U.S. 138, 142 (1973); *United States v. Int'l Broth. of Teamsters*, 170 F.3d

136, 142 (2d Cir. 1999).  Appeals under the APA present only a question of law, and the district

court conducts what is essentially an appellate review of the challenged administrative action.

*Sikh Cultural Soc'y, Inc. v. U.S. Citizenship & Imm. Servs.*, No. 15-CV-5158, 2017 WL

1232476, at *9 (E.D.N.Y. Mar. 30, 2017); *State of Connecticut v. U.S. Dep't of Commerce*, No.

04-CV-1271, 2007 WL 2349894, at *1 (D. Conn. Aug. 15, 2007) ("When a party seeks review of

agency action under the APA, the district judge sits as an appellate tribunal. The entire case on

review is a question of law." (quoting *Am. Bioscience*, 269 F.3d at 1083–84)).  "As such, these

cases are frequently disposed of on cross-motions for summary judgment."  *Sikh Cultural Soc'y,

Inc.*, 2017 WL 1232476, at *9 (first citing *Gosnell v. FDIC*, 938 F.2d 372, 375 (2d Cir. 1991);

and then citing *Miezgiel v. Holder*, 33 F. Supp. 3d 184, 186 (E.D.N.Y. 2014)).

In reviewing agency decisions under the APA, the Court "begin[s] by reviewing the

agency's construction of the statute at issue . . . by applying the familiar two-step process of

statutory interpretation" established by *Chevron U.S.A. Inc. v. Natural Res. Def. Council. Inc.*,

467 U.S. 837 (1984).  *Barahona v. Napolitano*, No. 10-CV-1574, 2011 WL 4840716, at *5

(S.D.N.Y. Oct. 11, 2011) (quoting *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 173 (2d Cir.

2006)).  Under *Chevron*, the Court first inquires whether "'Congress has directly spoken to the

precise question at issue'; if so, our inquiry is at an end."  *Bellevue Hosp. Ctr.*, 443 F.3d at 174

(quoting *Chevron*, 467 U.S. at 842–43).  However, "[i]f there is silence or ambiguity in the

statute . . . then the agency has discretion in implementation, and we ask only if the construction

it has given the statute is reasonable."  *Id.*

The reviewing court then considers whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (noting that "a reviewing court must hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). A decision is arbitrary or capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat. Resource Defense Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). The court's task is not to "engage in an independent evaluation of the cold record," *Guan v. Gonzalez*, 432 F.3d 391, 394–95 (2d Cir. 2005), nor to substitute its judgment for that of the agency, *Nat. Resource Defense Council*, 658 F.3d at 215, but to determine whether the agency has "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action," *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir 2000).

In addition, courts "will not disturb a factual finding if it is supported by reasonable, substantial and probative evidence in the record when considered as a whole." *Jian Hui Shao v. Mukasey*, 546 F.3d 138, 157–58 (2d Cir. 2008) (internal quotation marks and additional citations omitted) (citing *Wu Biao Chen v. INS*, 344 F.3d 272, 275 (2d Cir. 2003)). As a corollary, "when a petitioner bears the burden of proof, his failure to adduce evidence can itself constitute the 'substantial evidence' necessary to support the agency's challenged decision." *Id.* (citing *Zhou Yun Zhang v. INS*, 386 F.3d 66, 78–79 (2d Cir. 2004), *overruled in part on other grounds by Shi*

*Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296 (2d Cir. 2007) (en banc)). In an appeal of an administrative decision, "[t]he plaintiff bears the burden of showing that the agency's action should be set aside." *Sikh Cultural Soc'y*, 2017 WL 1232476, at *9 (quoting *Tarbell v. Dep't of Interior*, 307 F. Supp. 2d 409, 420 (N.D.N.Y. 2004)); *see also Miezgiel*, 33 F. Supp. 3d at 189 ("Plaintiffs bear the burden of showing, by citation to evidence in the administrative record, that an agency's actions are arbitrary and capricious.").

In this case, Plaintiffs' request for a declaratory judgment is derivative of Plaintiffs' request for review under the APA because it is premised on the claim that the VA arbitrarily and capriciously denied A1's reconsideration application. Because Plaintiffs challenge the same actions in seeking both forms of relief, the Court's analysis of the APA claim will govern the propriety of issuing a declaratory judgment concerning the underlying administrative action. *See Glara Fashion, Inc. v. Holder*, No. 11-CV-889, 2012 WL 352309, at *6 (S.D.N.Y. Feb. 3, 2012) (declining mandamus jurisdiction and declaratory judgment where the agency decision was not arbitrary under the APA); *All Aboard Worldwide Couriers v. AG*, 8 F. Supp. 2d 379, 382 (S.D.N.Y. 1998) (entering summary judgment against declaratory judgment action based on analysis of APA claim). Accordingly, the Court addresses Plaintiffs' claim under the APA by first discussing the reasonableness of the VA's interpretation of "control" and then determining whether the VA's action was arbitrary or capricious.

### ii. The VA's interpretation of "control" is reasonable and entitled to deference

Plaintiffs principally contend that the VA's definition of "control" is unreasonable because "the VA conflates the *power* to govern a company with the *ability* to manage a company." (Pls. Opp'n Mem. 14.) According to Plaintiffs, "the VA is not tasked with making eligibility determinations based on whether it *subjectively* believes a veteran has the *ability* to

manage [a] company.  Rather, the VA is solely tasked with making eligibility determinations based on the power to control an entity." (*Id.* at 15.)  Plaintiffs argue that "*control* or the '*power to govern*' is a legal determination" that should be derived from A1's organizational documents and "has nothing to do with whether [] Storms has the *ability* to manage a company." (*Id.*)  Defendants argue that the VA's definition of "control" reasonably includes the "power to manage" because Congress tasked the VA with ensuring that veterans, rather than non-veteran contractors, manage projects and benefit from the set-aside contracts.  (Defs. Mem. 21–22.)

### 1. *Chevron* step one

In the Veterans Benefits Act, Congress instructed the Secretary of the VA to verify that all SDVOSBs included in the VIP are "owned and controlled by veterans."  38 U.S.C. § 8127(f)(4).  The Veterans Benefits Act does not define the term "controlled," nor does it dictate criteria that the VA should use in examining SDVOSB applications.  Thus, because "there is silence or ambiguity in the statute" as to the meaning of "control," *see Bellevue Hosp. Ctr.*, 443 F.3d at 174 (quoting *Chevron*, 467 U.S. at 842–43), "the agency has discretion in implementation," and the Court will ask only whether the VA's construction of the statute is reasonable, *see id.*

### 2. *Chevron* step two

The VA promulgated regulations relating to control in 38 C.F.R. § 74.4.  The relevant regulations provide that:

> Control means both the day-to-day management and long-term decision-making authority for the [business] . . . .
>
> Control is not the same as ownership, although both may reside in the same person.  CVE regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations. . . . Individuals managing the [business] must have managerial experience of the extent and complexity needed to run the

> [business].  A veteran need not have the technical expertise or
> possess a required license to be found to control a[] [business] if he
> or she can demonstrate that he or she has ultimate managerial and
> supervisory control over those who possess the required licenses or
> technical expertise.

38 C.F.R. § 74.4(a)–(b).

In addition, the regulations specify that a non-veteran or entity may be found to have control in several circumstances, including where "[b]usiness relationships exist with non-veterans or entities which cause such dependence that the applicant or participant cannot exercise independent business judgment without great economic risk." *Id.* § 74.4(i)(4).

The Court finds that the VA's definition of "control" is reasonable.  As Defendants note, "[a]n individual cannot manage a contracting business — including without limitation the projects undertaken by that business — unless he or she is employed full-time at the business." (Defs. Mem. 21.)  In addition, it is entirely reasonable for the VA to consider, as part of an assessment of "control," whether the veteran applicant has the managerial experience and competence to operate the business so that day-to-day management is not dependent upon the skills and experience of non-veterans for whom the Veterans Benefit Act was not designed.  (*See* Defs. Reply in Further Supp. of Defs. Mot. ("Defs. Reply") 7, Docket Entry No. 132.)  Plaintiffs' argument that the VA should be restricted to assessing "control" as delineated in a business's organizational documents is not persuasive and lacks support.  Plaintiffs point to the definition of "control" in Black's Law Dictionary, which provides: "The direct or indirect power to govern the management and policies of a person or entity . . . ; the power or authority to manage, direct, or oversee."  Black's Law Dictionary (10th ed. 2014); (*see* Pls. Opp'n Mem. 15).  Plaintiffs' proposed definition of "control" would require the VA to elevate form over substance, effectively finding that a service-disabled veteran controls his business even if he is not

competent to manage it, so long as internal corporate rules and organizing documents delegate such control to him.

Accordingly, the Court concludes that the VA's interpretation of "control" to include managerial experience and competence is reasonable and affords it *Chevron* deference.

### iii. The VA did not arbitrarily or capriciously disregard evidence of control

Plaintiffs allege that although they provided additional evidence in the reconsideration application to demonstrate that Storms worked full-time at A1 and that his outside employment was minimal and did not affect his control of the business, the VA "arbitrarily and capriciously disregarded A1's statements and unlawfully denied A1's VIP application." (Pls. Opp'n Mem. 10–11.) Defendants do not address this argument specifically, but generally assert that the CVE determined that A1 had not remedied its earlier deficiencies and, in addition, the CVE found two independent grounds to deny reconsideration of the CVE Removal Decision. (Defs. Mem. 20, 25.)

The Court is mindful that its task is not to "engage in an independent evaluation of the cold record," *Guan*, 432 F.3d at 394–9, nor to substitute its judgment for that of the agency, *Nat. Resource Defense Council*, 658 F.3d at 215, but to determine whether the agency has "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action," *J. Andrew Lange*, 208 F.3d at 391. The Court concludes that the VA did.

The CVE "considered the pertinent evidence," *see id.*, when it compared Storms' written statement to the tax returns filed on behalf of Storms & Associates, to verify the legal services Storms provided; obtained public records of filings from the law firm and of registration and incorporation documents from HVAI; and reviewed Storms' statement and observed that Storms

did not specify the amount of hours he dedicated to running a legal office. (R. 685–87.) In reviewing this evidence, the CVE found that A1 had not "sufficiently corrected" the issue of control and management that prompted the CVE Removal Decision. (R. 684.) The CVE noted that in the CVE Removal Decision, Storms' combined work for HVAI and his law firm would have precluded him from devoting full time to A1, and Storms had not provided the required supplemental statement to demonstrate otherwise. (R. 685.) Storms had provided a statement with his reconsideration application, and although the CVE found that public record searches contradicted some of Storms' statements,[13] it concluded that Storms' involvement with HVAI, on its own, did not itself preclude him from working full-time for A1. (R. 685.) However, the CVE found that in view of the legal work that Storms asserted he completed for his law firm, in addition to public filing records reflecting additional legal work for non-A1 clients, it was "unlikely that a small law firm having the work described could provide the requisite level of legal support and services required, without these demands interfering with [Storms'] ability to manage the contracts and enterprises associated with A1." (R. 687.) In particular, the CVE was skeptical that the list of legal services Storms admitted to providing on behalf of A1, which included numerous protests and hearings, amounted to the only "four or five hours per month" that Storms claimed to devote to the law firm. (R. 685–86.) In addition to the inconsistency between the legal services and the time Storms devoted to the practice, the CVE reiterated that

---

[13] Specifically, the CVE noted that although Storms asserted that HVAI procures housing for veterans, public record searches reflected that HVAI provides mental health and crisis intervention services. (R. 685.) The CVE also observed that despite Storms' statement that he serves as President of HVAI and dedicates only four hours per month to the organization, Storms did not provide examples of the work he performed for HVAI and apparently had made no investment of time or effort in developing programming or starting the organization. (R. 685.) Based on this, the CVE concluded that "even in its infancy, this organization would require more than four hours of monthly service." (R. 685.) Ultimately, the CVE found that Storms' involvement with HVAI "d[id] not prohibit inclusion in the VIP program." (R. 685.)

legal work performed on behalf of A1 was not itself work for A1. (R. 687.) Finally, the CVE noted that the reconsideration application was "silent with respect to the time and effort required for the managerial and routine office administration of a law firm." (R. 687.)

Plaintiffs argue that the CVE based its control determination on an irrelevant factor — Storms' resume — and rely on *KWV, Incorporated v. United States*, a case from the Court of Federal Claims, to support their argument. (*See* Pls. Opp'n Mem. 9–11 (citing *KWV, Inc. v. United States*, 111 Fed. Cl. 119, 127 (2013)).) In *KWV*, a VOSB challenged the revocation of its VOSB status in connection with a bid protest. *See KWV*, 111 Fed. Cl. at 123–24. The court found that the VA had relied solely on the veteran's residency, divided between two states, to determine that the veteran was unable to manage the day-to-day operations of his business. *Id.* at 126. The court noted that "[r]esidency is not identified as an element of 'control' for purposes of [38 C.F.R. §] 74. Nonetheless, [the VA] focused specifically and solely on that fact as being dispositive as a matter of law." *Id.* Furthermore, the VA "did not address any of those factors that 38 C.F.R. § 74.4 does identify as being relevant to control, *viz.*, 'strategic policy setting,' 'day-to-day management and administration of business operations,' and 'managerial experience of the extent and complexity needed to run the concern.'" *Id.* The court also noted that nothing else in the administrative record suggested the veteran was not exercising sufficient control over his business. *See id.* at 127.

By contrast, here, the CVE properly considered Storms' resume together with the submitted documents and public record in making the CVE Removal Decision. Plaintiffs argue that "[l]ike residency, a resume 'is not identified as an element of "control" for purposes of Part 74' — it was therefore unlawful for the VA to base its eligibility decision on Mr. Storms' resume." (Pls. Opp'n Mem. 9 (quoting *KWV*, 111 Fed. Cl. at 126).) But a resume is not like

residency status.  In this case, Storms' resume informed the CVE that, *according to Storms himself*, he was involved with various other organizations that the CVE considered in determining whether any of those activities detracted from Storms' ability to control A1 full-time.  The onus was on Storms, as an "owner engaged in employment or management outside the applicant [business]," to "submit a written supplement to the application which demonstrates that such activities will not have a significant impact [on] [his] ability to manage and control the applicant [business]."  (R. 361 (citing 38 C.F.R. § 74.4(c)(1)).)  Unlike residency, which is not mentioned anywhere in the VA's regulations and does not directly bear on the VA's assessment of control, the resume indicated to the CVE that Storms was involved in other potentially time-consuming activities, which, according to the VA's regulations, may bear on a veteran's control.  *See* 38 C.F.R. § 74.4(b) ("CVE regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations.").  The Reconsideration Decision articulates the VA's reasoning for finding that although the HVAI presidency, on its own, did not affect Storms' ability to control A1, the independent law practice did.  Thus, unlike in *KWV*, the VA has "provided a coherent and reasonable explanation of its exercise of discretion" and "articulated a 'rational connection between the facts found and the choice made.'"  *See KWV*, 111 Fed. Cl. at 127 (first quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001); and then quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Accordingly, the Court grants Defendants' motion as to Plaintiffs' APA claim.

### f. Due Process claim

Plaintiffs argue that the VA violated A1's right to procedural due process[14] when it
(1) failed to allow A1 to respond to the other independent grounds on which the VA denied
reconsideration of the Removal Decision, and (2) failed to comply with the VA's own mandatory
policies and procedures.  (Pls. Opp'n Mem. 17, 19–20.)  Defendants argue that the VA provided
A1 the opportunity to immediately file a new application after the Reconsideration Decision and
that the policies and procedures at issue were either not mandatory or not applicable.  (Defs.
Mem. 23–24.)

### i. Property interest

The Constitution imposes "constraints," ordinarily in the form of notice and a pre-
deprivation hearing, on "governmental decisions which deprive individuals of 'liberty' or
'property' interests within the meaning of the Due Process Clause" of the Fifth and Fourteenth
Amendments.  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see also Barrows v. Burwell*, 777
F.3d 106, 113 (2d Cir. 2015) (citing *Mathews*, 424 U.S. at 332).  Because the requirements of
procedural due process "apply only to the deprivation of interests encompassed by the
[Constitution's] protection of liberty and property" and because "the range of interests protected
by procedural due process is not infinite," *see Bd. of Regents of State Colls. v. Roth*, 408 U.S.
564, 569–70 (1972), the "first inquiry in every due process challenge is whether the plaintiff has

---

[14]  Although the TAC mentions a substantive due process claim in passing, (*see* TAC
¶ 40), Plaintiffs have not pled a substantive due process claim or argued it in opposition to
Defendants' motion.  Plaintiffs' due process claim instead rests on two statements: first, that
"[t]he CVE's refusal to adjudicate Plaintiffs' request for reconsideration violated Plaintiffs' Fifth
Amendment procedural due-process rights because the CVE did not afford A1 a meaningful
process to review and respond to [removal]," (*id.* ¶ 24); and second, that "[t]he VA's failure to
provide A1 with a Hybrid Letter setting forth the new grounds to deny A1's VIP application . . .
violated Plaintiffs' Fifth Amendment procedural rights," (*id.* ¶ 34).

been deprived of a protected interest in 'property' or 'liberty,'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). If the court finds that the plaintiff has been deprived of such an interest, it evaluates whether the government's procedures comport with due process. *See id.*

The Due Process Clause safeguards the "security of interests that a person has already acquired in specific benefits." *Roth*, 408 U.S. at 576; *see Duncan*, 107 F. Supp. 3d at 347. While those interests may take many forms, "not all benefits programs create constitutional property interests," *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005), nor does a property interest "exist solely because of the importance of the benefit to the recipient," *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir. 1991). "'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Roth*, 408 U.S. at 577); *see also Barrows*, 777 F.3d at 113; *Kapps*, 404 F.3d at 113.

To determine whether an administrative framework yields a "legitimate claim of entitlement" to benefits, courts consider "whether the statutes and regulations governing the distribution of benefits . . . 'meaningfully channel[] official discretion by mandating a defined administrative outcome.'" *Barrows*, 777 F.3d at 113 (quoting *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003)). If the statutory or regulatory scheme "sets fixed eligibility criteria for the receipt of . . . benefits," a property interest often will be found. *See Kapps*, 404 F.3d at 113–14; *see also Town of Castle Rock*, 545 U.S. at 756 ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion."). By contrast, where "the statute, regulation or contract in issue vests in the [government] significant discretion over the continued conferral of [a] benefit, it will be the rare case that the recipient will be able to establish an entitlement to that

benefit." *Kelly Kare*, 930 F.2d at 175. Thus, "[w]here the administrative scheme does not require a certain outcome, but merely authorizes particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection" under the Due Process Clause. *Sealed*, 332 F.3d at 56 (emphasis omitted).

The Court has not located, and the parties have not identified, case law explicitly holding that the SDVOSB framework creates an entitlement subject to due process requirements, although two cases from the Court of Federal Claims suggest as much without so holding. *See Ambuild Co., LLC v. United States*, 119 Fed. Cl. 10, 15 (2014) (holding that the SDVOSB did not receive meaningful notice or an opportunity to be heard on issues of ownership that formed the basis of the VA's decision); *Miles Constr. LLC v. United States*, 108 Fed. Cl. 792, 804 (2013) ("An agency should not act without affording an entity whose award or projected award is protested with notice of an alleged defect and an opportunity to respond."). The Court declines to decide whether Plaintiffs have a property interest in their SDVOSB status[15] because, assuming they do, the VA's rules afford due process.

### ii. Process due

Assuming Plaintiffs had a constitutionally protected property interest in continued SDVOSB status that allows them to participate in VA set-aside contracts, Plaintiffs' due process claim nevertheless fails because the VA's rules afford SDVOSBs all the process that is constitutionally due. "The touchstone of due process . . . is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it."

---

[15] Nor have Plaintiffs attempted to argue that A1 had a cognizable property interest in being designated an SDVOSB. Plaintiffs' only argument is relegated to a footnote in their opposition brief, which reads, "[d]e-listing A1 from the VIP database deprived A1 of a constitutionally protected property and liberty interest." (Pls. Opp'n Mem. 16 n.6.)

*Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (second alteration in original); *see*

*also Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity

to be heard at a meaningful time and in a meaningful manner." (internal quotation marks

omitted)).  The process due in any given situation "will depend on appropriate accommodation

of the competing interests involved." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982)

(footnote and internal quotation marks omitted).  Ultimately, however, "[t]here is no rigid

formula that determines the constitutional sufficiency of the process employed in connection

with any given deprivation of a protected interest." *DiMichele v. Greenburgh Cent. Sch. Dist.*

*No. 7*, 167 F.3d 784, 791 (2d Cir. 1999).

In the realm of administrative law, due process requires that:

> Before adverse action is to be taken by an agency, . . . the individual
> immediately concerned should be apprised not only of the
> contemplated action with sufficient precision to permit his
> preparation to resist, but, before final action, he should be apprised
> of the evidence and contentions brought forward against him so that
> he may meet them.

*AmBuild*, 119 Fed. Cl. at 21 (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S.

123, 169 n.16 (1951) (Frankfurter, J., concurring)).

### 1. The VA provided notice and an opportunity to respond

Plaintiffs specifically argue that because they "had no notice or [] meaningful opportunity

to respond to all of the new grounds that the Reconsideration Decision was based on," the

Reconsideration Decision "violates procedural due process of law."  (Pls. Opp'n Mem. 17.)

Although the VA provided A1 the opportunity to immediately file a new application after the

Reconsideration Decision, Plaintiffs argue that due process requires notice before, not after, an

agency's final action, and that the VA was required to issue a "hybrid denial" that allowed A1 to

respond to the new grounds for denial in the Reconsideration Decision.  (*Id*.)  Defendants argue

that the VA did not violate due process by failing to allow A1 to respond to the additional grounds on which the VA denied reconsideration because the Reconsideration Decision could rest on the independent basis that Storms did not exercise full control over A1.[16]  (Defs. Mem. 24–25.)

The VA's regulations specify that "an applicant may request that the Director, CVE, reconsider his or her decision to deny an application by filing a request for reconsideration with CVE within [thirty] days of receipt of CVE's denial decision." 38 C.F.R. § 74.13(a).  The CVE "will issue a written decision within [sixty] days, when practicable, of receipt of the applicant's request." *Id.* § 74.13(b).  In the reconsideration decision the CVE "may either approve the application, deny it on the same grounds as the original decision, or deny it on other grounds," but if denied, the CVE "will explain why the applicant is not eligible for the [VIP] and give specific reasons for the denial." *Id.*  The rules provide that if the CVE "denies the application *solely* on issues not raised in the initial denial, the applicant may ask for reconsideration as if it were an initial denial," a process that the VA terms a "hybrid denial." *Id.* § 74.13(c) (emphasis added).  Otherwise, "the decision on the request for reconsideration shall be final." *Id.* § 74.13(f).

It is not clear, from Plaintiffs' brief, whether Plaintiffs argue simply that the VA did not comply with its "hybrid denial" procedure, or whether Plaintiffs also argue that the hybrid denial procedure does not provide adequate process because it permits the VA to rest a final

---

[16]  In the Reconsideration Decision, in addition to finding that Storms did not exercise full control over A1, the VA raised two additional grounds to deny A1's reconsideration application: (1) that Storms lacked the managerial skills to manage A1, given the broad range of services that A1 purportedly performed under its SDVOSB set-aside contracts, and (2) that A1 had made false statements to the VA.  (R. 692–95.)  The VA did not raise either ground in the CVE Removal Decision.

reconsideration decision based in part, but not wholly, on new and unnoticed grounds of denial. Nevertheless, having examined the VA's rules for reconsideration decisions, the Court concludes that the VA's rules, as written, provide sufficient notice and opportunity to respond to the grounds for denial of SDVOSB status in both "hybrid denial" situations, where the CVE denies the application solely on issues not raised in the initial denial, and a situation such as this one, where new grounds arise for a denial of reconsideration but old issues from the initial denial were not resolved.

When an SDVOSB application is denied, the applicant is informed, in writing, of the grounds for the denial and granted an opportunity to remedy deficiencies through the reconsideration process. If, during the reconsideration process, the VA identifies additional grounds to deny an application *and* the initial grounds for denial are remedied through the applicant's reconsideration materials, the applicant is given yet another attempt to address the deficiencies through a second reconsideration process. However, if, as in this case, the VA identifies additional grounds to deny an application and the initial grounds for denial are *not* remedied through the applicant's reconsideration materials, the VA does not permit an appeal of the reconsideration decision. *See* 38 C.F.R. §§ 74.13(c), (f) (stating that unless the CVE denies the application "solely on issues not raised in the initial denial," "the decision on the request for reconsideration shall be final").

Plaintiffs do not provide legal support for their argument that additional process is due in a case, where, as here, the VA provides several independent bases for the denial and an applicant had full notice and an opportunity to respond to at least one of those grounds. *See Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 169 (stating that before an agency deprives an individual of property or liberty, he should "be apprised not only of the contemplated action with sufficient

precision to permit his preparation to resist, but, before final action . . . [to] be apprised of the evidence and contentions brought forward against him so that he may meet them"). Plaintiffs' argument that they were not apprised of the contemplated action — here, non-renewal of A1's SDVOSB status — or of the evidence to support that action is unavailing. *See id.*

Relying on *Ambuild*, 119 Fed. Cl. at 15, Plaintiffs argue that the VA was required to "apprise Plaintiffs of all of the specific grounds it relied on to revoke A1's VIP status" before, and not after, the revocation. (Pls. Opp'n Mem. 17.) But *Ambuild* is distinguishable for multiple reasons. In *Ambuild*, the plaintiff SDVOSB, AmBuild Co., submitted a bid to the VA in response to a solicitation. *Ambuild*, 119 Fed. Cl. at 15. Another bidder filed a formal protest with the VA, alleging that AmBuild's owner did not control AmBuild as required by 38 C.F.R. § 74.4 and that AmBuild did not meet the size requirements of an SDVOSB. *Id.* The VA gave AmBuild notice of the protest, and AmBuild responded to the identified issues. *Id.* However, the VA *sua sponte* initiated consideration of an additional ownership issue that was not previously raised by the protestor and was not conveyed to AmBuild. *Id.* at 16. Based on the unnoticed ownership issue, the VA determined that AmBuild did not meet the ownership requirements of an SDVOSB and, consequently, decertified AmBuild as an SDVOSB and removed it from the VIP. *Id.* The court found that:

> [d]uring the agency-level protest, AmBuild did not, at a 'meaningful time and in a meaningful manner,' have notice of, or an opportunity to be heard on, issues concerning unconditional ownership. CVE acted *sua sponte* without giving notice to AmBuild that it was entering upon consideration of unconditional ownership. Because that issue was never raised in the [third-party] protest or by the . . . referral of the protest, AmBuild did not address its ownership structure when it was responding to the protest. Indeed, AmBuild was entirely unaware of CVE's self-initiated investigation until its disqualification was rendered in CVE's determination . . . .

*Id.* at 22 (citations omitted). Unlike AmBuild, which received no notice of the grounds that ultimately led the VA to disqualify it from the SDVOSB program, A1 had notice of the precise grounds on which the VA principally relied to deny reconsideration — that Storms was not able to exercise full-time control over A1 while he managed two other enterprises. (*See* R. 360–63.) Had the VA found that Storms otherwise met the conditions of control in 38 C.F.R. § 74.4 and rectified the problems the agency identified through his resume, and had the VA nevertheless denied A1's reconsideration request on the two additional grounds of managerial skills and false statements, Plaintiffs' facts would more closely resemble those in *AmBuild*.

In addition, AmBuild, unlike A1, was not reapplying for SDVOSB status as a routine matter when its SDVOSB status expired and therefore risking, from the outset, an unfavorable result; rather, AmBuild had active SDVOSB status that was revoked without notice and an opportunity to respond as a result of a protest to the award of a contract to AmBuild. *See Ambuild*, 119 Fed. Cl. at 15. The court in *Ambuild* specifically held that "terminating AmBuild's SDVOSB status without notifying or giving AmBuild the opportunity to respond to the unconditional ownership issue" contravened "the minimal requirements for an informal adjudication set forth in Section 555 of the APA," which correspond to procedural due process. *Id.* at 23; *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (explaining that the "minimal [procedural] requirements" of Section 555 of the APA allow a party to participate in an ongoing agency proceeding). By contrast, here, A1 was informed of the exact grounds on which the VA decided the CVE Removal Decision, was given a chance to remedy those deficiencies, (*see* R. 507–09), and, according to the VA's Reconsideration Decision, did not adequately do so. That the VA relied on other deficiencies to supplement the unfavorable Reconsideration Decision did not deprive A1 of due process where the opportunity

to remedy those deficiencies would not have altered the outcome of the Reconsideration Decision. Indeed, even if Plaintiffs were able to demonstrate that further process was warranted, "where the party challenging agency action fails to show that the agency's error may have affected the outcome of the proceedings below, the error is not prejudicial, and it would be senseless to vacate and remand for further proceedings." *CS-360 LLC*, 856 F. Supp. 2d at 186 (quoting *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010)).

Furthermore, in recognition that agencies' freedom to fashion their own procedural rules is a "very basic tenet of administrative law," the Supreme Court has held that a reviewing court may not impose upon an agency procedural requirements beyond those set forth by Congress or by the agency itself. *See Vt. Yankee Nuclear Power Corp. v. Nat. Resources Defense Council, Inc.*, 435 U.S. 519, 524, 543–44 (1978). That tenet applies equally to informal decision-making like the kind undertaken by the VA here. *Pension Benefit Guar. Corp.*, 496 U.S. at 654.

In sum, A1 re-applied for SDVOSB status and was afforded the opportunity to submit written materials in support of its initial application; it was then informed that its application was denied because it lacked the required control and that it could seek reconsideration by explaining Storms' activities with HVAI and Storms & Associates; it was afforded the opportunity to submit additional materials in support of that request for reconsideration, which it did; and the VA provided a written explanation for its Reconsideration Decision, in which it found that A1 had not remedied the original issue regarding control and also found that two additional and independent issues precluded A1 from receiving SDVOSB status. Even after the process concluded, A1 was "immediately eligible to submit a new application for the [VIP]," which the VA stated it would "process . . . as it would an initial application." (R. 695.) Moreover, A1 was

afforded the benefit of judicial review under the APA. Under these circumstances, to the extent process was required, A1 received all the process it was due. *See Spinelli*, 579 F.3d at 169 (finding that "[t]he touchstone of due process . . . is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it"); *see also Logan*, 455 U.S. at 434 (noting that process due will "depend on appropriate accommodation of the competing interests involved").

### iii. The VA did not violate mandatory policies and procedures

Separately, Plaintiffs argue that the VA violated "mandatory policies and procedures" that require it to issue a reconsideration decision within sixty days of a reconsideration request and to advise an applicant in a "hybrid letter" if any "additional denial reasons" preclude a favorable reconsideration decision. (Pls. Opp'n Mem. 19.) Defendants argue that the policies are not "mandatory" — the VA is required to issue a reconsideration decision within sixty days "when practicable," and it is not required to issue a hybrid denial in circumstances like the one at issue. (Defs. Mem. 22, 24–25.)

Although "[t]here is a strong presumption favoring judicial review of administrative action," *Salazar*, 822 F.3d at 75, that presumption is "subject to a narrow exception: the APA's prohibition against judicial review of agency action 'committed to agency discretion by law,'" *id.* at 76 (quoting 5 U.S.C. § 701(a)(2)). Where the statutes or regulations at issue in a case "are drawn in such broad terms that . . . there is no law to apply," courts cannot discern meaningful boundaries to fetter agency discretion. *Id.* (quoting *Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015)). "To determine whether there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's exercise of discretion, the

courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action." *Id.*

Agency regulations can provide a court with law to apply because, as the Supreme Court has noted, "where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Id.* at 76 (quoting *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974))). The Supreme Court has explained that:

> Though the agency's discretion is unfettered at the outset, if it announces and follows — by rule or by settled course of adjudication — a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as arbitrary, capricious or an abuse of discretion.

*Id.* at 76–77 (quoting *I.N.S. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)); *see also Brezler*, --- F. Supp. 3d. at ---, 2016 WL 7100497 at *18 ("The Navy, like any other agency, must comply with its own binding rules." (citing *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir. 1969))); *cf. Prospect Heights Action Coal. v. City of New York*, No. 02-CV-4693, 2002 WL 32096583, at *5 (E.D.N.Y. Oct. 22, 2002) (crediting a theory that "the city's allegedly deliberate failure to comply with its own regulations, if proved, would be the sort of arbitrary governmental action proscribed by the Due Process Clause." (quoting *C.A.U.T.I.O.N., Ltd. v. City of New York*, 898 F. Supp. 1065, 1074 (S.D.N.Y. 1995))). The Court considers Plaintiffs' challenges to specific VA regulations below.

### 1. 38 C.F.R. § 74.13(b)

Plaintiffs argue that the VA violated 38 C.F.R. § 74.13(b), which provides that the VA "will issue a written decision within [sixty] days, when practicable, of receipt of the applicant's

request [for reconsideration]." 38 C.F.R. § 74.13(b). There is no dispute that the VA failed to respond to A1's reconsideration request between November 21, 2011, and August 30, 2013; according to the CVE, upon receiving A1's reconsideration request it informed A1 that "[a]lthough CVE has [sixty] days to complete requests for reconsideration, we seek to complete the action as soon as possible" and accordingly, A1 could "expect to receive a decision no later than November 21, 2011." (R. 502, 504.)

According to the VA, "[b]efore [it] could issue a decision on the request for reconsideration, VA commenced an investigation into an incident that took place in November 2011, in which A1 misrepresented its status as an SDVOSB." (Defs. Resp. to Order to Show Cause ("Defs. OSC Resp.") at 6, Docket Entry No. 9.) As the VA noted in the Reconsideration Decision, it found that between August and November of 2011, A1 had represented itself as an SDVOSB and continued to make offers to the VA on SDVOSB set-aside contracts despite having been denied status months earlier, in the CVE Removal Decision. (R. 693.) "Since the November 11 incident and the CVE Decision both dealt with A1's status as an SDVOSB, CVE decided to defer action on the request for reconsideration pending the outcome of the investigation, and any enforcement actions resulting from that investigation." (Defs. OSC Resp. at 6.) The VA instituted a debarment action against A1 on January 20, 2012[17] and A1 was debarred from May 2, 2012 until February 19, 2013, when the debarment was vacated. (*See* Defs. Mem. 8 n.5; Defs. OSC Resp. at 7.) The debarment was vacated because it was based in part on incidents for which the VA did not provide notice to A1, and to which A1 was not given

---

[17]  A1 was debarred pursuant to 38 U.S.C. § 8127(g), which provides that "[a]ny business concern that is determined by [the VA] to have misrepresented its status . . . as a[n SDVOSB] shall be debarred from contracting with [the VA] for a reasonable period of time, as determined by [the VA]." (*See* Defs. OSC Resp. at 3.)

the opportunity to respond. (Defs. OSC Resp. at 7.) Plaintiffs commenced the instant action on February 13, 2013, and on August 9, 2013, the Court ordered the VA to rule on Plaintiffs' application for reconsideration. (*See* Order dated Aug. 9, 2013.)

In view of this procedural history, the Court cannot conclude that the VA violated a mandatory policy or procedure when it took over sixty days to issue the Reconsideration Decision. Although the VA clearly did not act expeditiously, the Court's inquiry is whether the VA acted arbitrarily, capriciously or in violation of due process by failing to comply with an internal and self-imposed regulation. Because any business that is debarred is prohibited from contracting with the VA, *see* 38 U.S.C. § 8127, Defendants argue that the VA had no reason to continue considering A1's reconsideration request because it would not be permitted to re-enlist as an SDVOSB while it was debarred. (Defs. Mem. 9–10.) The text of 38 C.F.R. § 74.13(b) plainly states that the VA is bound to process applications for reconsideration within sixty days, "when practicable," *see* 38 C.F.R. § 74.13(b), and the VA's actions do not represent "an irrational departure from that policy" where the agency reasonably considered the reconsideration request to be mooted by debarment, *Salazar*, 822 F.3d at 76. Had the VA simply waited two years to issue a decision on A1's reconsideration request, the Court's analysis might differ; however, in view of the intervening events, the Court cannot conclude that the VA irrationally departed from a policy of processing reconsideration applications within sixty days "when practicable." *See* 38 C.F.R. § 74.13(b). Accordingly, the Court finds that the VA did not violate 38 C.F.R. § 74.13(b).

## 2. 38 C.F.R. § 74.13(c)

Plaintiffs also argue that "[m]andatory VA policies and procedures required the VA to issue a 'hybrid letter' in the event <u>any</u> 'additional denial reasons' are made, and 'the applicant

will be allowed to respond to <u>all issues</u> in an effort to clear expanded denial issues.[']"  (Pls.

Opp'n Mem. 19 (quoting CVE Procedure Request for Reconsideration ("CVE Reconsideration

Procedures") at 9, Docket Entry No. 130-7).)  Defendants argue that they were not required to

issue a "hybrid denial," which would have given A1 an opportunity to seek a second

reconsideration limited to issues raised for the first time in the Reconsideration Decision.  (Defs.

Mem. 24.)

     Plaintiffs' argument is predicated on language in the CVE's Reconsideration Procedures,

an internal document issued to CVE employees as of February 1, 2013 that Plaintiffs annex to

their opposition memorandum.  (*See* CVE Reconsideration Procedures at 9.)  Section 3.3 of the

CVE Reconsideration Procedures relates to "Hybrid Letter Procedures," and reads:

> 3.3.1   If [the Office of the General Counsel ("OGC")] finds
> additional denial reasons in review of evaluation denial case or
> review of other hybrid cases completed by OGC, this case will be
> deemed a hybrid denial.
>
> 3.3.2  Additional denial reasons will be added to denial letter sent to
> applicant.
>
> 3.3.3  If a case becomes a hybrid the applicant will be allowed to
> respond to all issues in an effort to clear expanded denial issues.
> Process hybrid denial letter.  Process will go to Step 3.2.1.

(CVE Reconsideration Procedures at 9.)  The Hybrid Letter Procedures continue with a chart that

explains the various types of letters the VA will issue in response to a request for

reconsideration:

| Output | Detail of Outputs and Remarks |
| --- | --- |
| Denial Letter | • Applicant has not met the requirements of 38 CFR Part 74 <br><br> • Applicant can reapply after [six] months |

| Approval Letter | • Applicant has satisfied the requirements of 38 CFR Part 74 |
|---|---|
| Hybrid Letter | • Applicant has resolved issues prompting denial but new issues require resolution.<br><br>• Applicant has [thirty] days to submit supporting documentation that meets the requirements of 38 CFR Part 74 |

(*Id.*)  The CVE Reconsideration Procedures thus create some ambiguity about when a case becomes a "hybrid."  Section 3.3.1 suggests that a case becomes a hybrid if the OGC finds reasons to deny an application that extend beyond the reasons given in the initial determination, whereas the chart suggests that a hybrid letter is only appropriate when the applicant has actually *resolved* the initial issues prompting denial "but new issues require resolution."  (*Id.*)  Under Section 3.3.1, A1 thus would have been entitled to a hybrid letter — and, in turn, a type of second reconsideration decision — because the VA identified additional reasons to deny A1's application, which reasons were not conveyed to A1 during the CVE Removal Decision.  Under the structure outlined in the chart, A1 would only be entitled to a hybrid letter if A1 had fully resolved Storms' control issues relating to HVAI and the law firm that the VA identified in the CVE Removal Decision, and if the VA had identified the additional two deficiencies of management and misrepresentations to the agency.

As Defendants note, the hybrid denial procedures, however ambiguous, are derived from 38 C.F.R. § 74.13(c), which clearly states the VA's policy: an applicant may seek a second reconsideration only if the decision on the first request for reconsideration "denie[d] the application *solely* on issues not raised in [the VA's] initial denial."  38 C.F.R. § 74.13(c) (emphasis added).  The regulation thus supports a reading of the CVE Reconsideration

Procedures consistent with the chart, which permits a second request for reconsideration only if the applicant's initial request for reconsideration "resolved issues prompting [the initial] denial but new issues require resolution." (*See* CVE Reconsideration Procedures at 9.) The Court credits the VA's promulgated regulation over an arguably ambiguous internal policy. *See Coeur Alaska, Inc. v. S.e. Alaska Conserv. Council*, 557 U.S. 261, 278 (2009) (explaining that where the statute is ambiguous, a court turns to the agency's regulations, and only where regulations are ambiguous does a court turn to "the agencies' subsequent interpretation of those regulations," such as an internal memorandum); *see also Perez v. Mortgage Bankers Ass'n*, 575 U.S. ---, ---, 135 S. Ct. 1199, 1207 (Mar. 9, 2015) (emphasizing that "[a]gencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have chosen not to grant them." (citation omitted)); *Barnhart v. Walton*, 535 U.S. 212, 221–22 (2002) (deferring to an agency's interpretation of its formal regulations).

The Reconsideration Decision did not "deny [A1's reconsideration application] solely on issues not raised in [the CVE Removal Decision]," *see* 38 C.F.R. § 74.13(c) — i.e., the Reconsideration Decision did not deny A1's application solely on the unnoticed grounds of managerial experience or the misrepresentations to the VA. The Reconsideration Decision explicitly states that "A1 has not overcome the grounds upon which its initial application was denied." (R. 692.) It then goes on to note that, "[s]econdary to the issues raised in CVE's initial denial determination, . . . CVE has identified an additional ground which prohibits A1's inclusion in VIP."[18] (R. 692.) Because the two new bases for the Reconsideration Decision

---

[18] The Reconsideration Decision refers variously to "an" additional ground and "two" additional grounds, presumably because the first new basis for denial — Storms' lack of management experience in the relevant industries — also relates to control of A1. (*See* R. 692.)

were not the sole bases for the unfavorable outcome, the VA's mandatory rules did not require it to provide A1 with a hybrid denial and, by extension, an opportunity to seek a second reconsideration limited to the additional issues. As Defendants aptly note, "even if A1 were to convince CVE that the additional bases should not have constituted grounds for denial of A1's application, the denial of the [reconsideration application] would have stood" because A1 had not remedied the original deficiency relating to control. (Defs. Mem. 25.)

Because Plaintiffs have not demonstrated that Defendants acted arbitrarily or capriciously or denied A1 the process it was due in the Reconsideration Decision, the Court denies Plaintiffs' request to "overturn and vacate the VA's Reconsideration Decision" and grants Defendants' motion for summary judgment as to Plaintiffs' request for injunctive relief.

### g.  Declaratory judgment

The Court also grants Defendants' motion for summary judgment as to Plaintiffs' request for declaratory judgment, pursuant to 28 U.S.C. § 2201. The Declaratory Judgment Act "does not create a source of substantive rights" for parties. *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 431 (S.D.N.Y. 2002) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995)). Rather, it is a procedural mechanism by which a party asks that a court declare that party's rights. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969); *see also United States v. Doherty*, 786 F.2d 491, 498 (2d Cir. 1986) (noting that a declaratory judgment allows a party to "avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit"). For the reasons set forth above, Plaintiffs have failed to demonstrate the existence of any right that is being or is likely to be infringed, and therefore the Court finds no basis to grant Plaintiffs declaratory relief. *See Glara Fashion, Inc.*, 2012 WL 352309, at *6 (declining mandamus jurisdiction and

declaratory judgment where the agency decision was not arbitrary under the APA); *All Aboard Worldwide Couriers*, 8 F. Supp. 2d at 379 (entering summary judgment against declaratory judgment action based on analysis of APA claim).

**III. Conclusion**

For the foregoing reasons, the Court grants Defendants' motion for summary judgment in its entirety.

SO ORDERED:

_____s/ MKB_____

MARGO K. BRODIE
United States District Judge

Dated: June 20, 2017
      Brooklyn, New York